199 P.3d 57

**STATE of Hawai'i, Respondent–Appellee,**

v.

**Alfred J. ROMAN, Petitioner–Appellant.**

No. 26359.

Supreme Court of Hawai'i.

Sept. 11, 2008.

As Amended Sept. 17 and Sept. 22, 2008.

Henry P. Ting, Deputy Public Defender (Deborah L. Kim, Deputy Public Defender, on the application), for petitioner/defendant-appellant, Alfred J. Roman.

Mary Ann Hollocker, Deputy Prosecuting Attorney, for respondent/plaintiff-appellee, State of Hawai'i.

MOON, C.J., LEVINSON, and DUFFY, JJ., NAKAYAMA and ACOBA, JJ., concurring separately.

Opinion of the Court by MOON, C.J.

On June 4, 2008, this court accepted a timely application for a writ of certiorari, filed on May 12, 2008 by petitioner/defendant-appellant Alfred J. Roman, requesting this court to review the February 11, 2008 judgment of the Intermediate Court of Appeals (ICA), entered pursuant to its January 22, 2008 summary disposition order. *See State v. Roman*, No. 26359, 2008 WL 176495 (App. Jan. 22, 2008) (SDO) (Nakamura, J., dissenting). Therein, the ICA affirmed the Family Court of the Third Circuit's December 26, 2003 judgment,[1] entered subsequent to a bench trial, convicting Roman of and sentencing him for abuse of family or household members, in violation of Hawai'i Revised Statutes (HRS) § 709–906(1) (Supp.2005).[2]

In his application, Roman argues, *inter alia*, that, although the ICA correctly concluded that the family court wrongly ruled that the parental discipline defense under HRS § 703–309(1) (1993), quoted *infra*, was inapplicable to the instant case, it erred in ultimately affirming his conviction. Specifically, Roman contends that the ICA erred in holding that the family court's erroneous refusal to apply the parental discipline defense was harmless based on its conclusion that respondent/plaintiff-appellee State of Hawai'i (the prosecution) had adduced sufficient evidence at trial to negate the defense beyond a reasonable doubt. Oral argument before the supreme court was held on August 21, 2008.

As discussed more fully *infra*, we agree with the ICA that the family court erred in ruling that the parental discipline defense was inapplicable, but hold that the ICA erred in concluding that the family court's erroneous ruling was harmless. Consequently, we vacate the ICA's February 11, 2008 judgment and reverse the family court's December 26, 2003 judgment.

## I. BACKGROUND

### A. The Bench Trial

On September 11, 2002, Roman was charged by way of complaint with one count of abuse of family or household members, in violation of HRS § 709–906, for "intentionally, knowingly or recklessly [causing] physical[ ] abuse" to the seventeen-year-old son [hereinafter, Minor] of his girlfriend, Kim Powell [hereinafter, Mother]. A one-day bench trial commenced on November 7, 2003. The record indicates that Roman intended to rely upon the justification of self-defense and the parental discipline defense. The prosecution called several witnesses, including Minor and three police officers who responded to the incident—Officers Kelly Matsumoto, Reginald Saludares, and Dane Bolos.[3] Roman testified in his own defense.

---

1. The Honorable George S. Yuda presided over the underlying proceedings.

2. HRS § 709–906(1) provides in relevant part that "[i]t shall be unlawful for any person, singly

or in concert, to physically abuse a family or household member[.]"

3. Minor's brother was also called as the prosecution's witness. *See infra* note 4.

### 1. Minor's Testimony

Minor testified that, at the time of the incident on May 12, 2002, he was seventeen years old and living with his mother and his mother's boyfriend (Roman) in Roman's house located in Hawaiian Acres, Puna District, on the island of Hawai'i. May 12, 2002 was Mother's Day, and Roman had planned to prepare tacos for Mother's Day dinner. Minor related that, at approximately 5:30 p.m., Roman instructed Minor to grate cheese for the tacos; however, Minor remained "laying on a futon watching television" and did not perform the requested task. According to Minor, Roman "asked me again [to grate the cheese]—the second time he asked me, I went to go do it[;] he told me I was doing it wrong and to go lay down or sit down." Minor went and sat in the living room; Roman then left his house to run an errand. Forty-five minutes to an hour later, Roman returned and started yelling at Minor because he did not grate the cheese correctly. With respect to the subsequent events, the colloquy between the prosecution and Minor revealed the following:

Q. [By the Prosecution:] So after [Roman] came into the house and he was yelling at you, what did he do next?

A. [By Minor:] Um, he, he, um, he [(Roman)] started coming towards me then he started kicking me in my back.

Q. He kicked you in your back?

A. Yep.

Q. Can you tell me where on your back?

A. My lower back.

Q. Left or right side, if you know?

A. I don't know.

Q. And how many times did he kick you?

A. Couple.

Q. And what did he kick you with?

A. His leg.

Q. Okay. What happened after that?

A. Then I got up and then he started yelling at me some more and he whacked me couple times.

Q. When you say he whacked you, what does that mean?

A. He hit me with his hand.

Q. Was it an open hand?

A. I don't remember.

Q. Where did he hit you?

A. My face.

Q. How many times?

A. A couple. . . . About two.

Q. When you were kicked in the back, how did you feel?

A. A little sore.

Q. What about when you were hit in the face?

A. Same.

Q. Sore?

A. Yeah.

Minor further testified that Mother tried to intervene, but was struck by Roman. Thereafter, Roman called the police to report the incident that he had hit Minor and Mother. Minor stated that, after the incident, he went to stay with his father; while at the father's home, his step-mother called the police to "make a statement because [Minor] had a mark on [his] face." When asked to describe the mark on his face, Minor stated that it was "a lump and was red."[4] Minor also stated that, during the course of that evening, Roman had consumed about a case of beer.

On cross-examination, defense counsel questioned Minor regarding a written statement that he made to the police on the night of the incident:

Q. [By Defense Counsel:] . . . [Do] you remember filling out a written statement for the police?

. . . .

A. [By Minor:] Yeah.

Q. Do you remember that you told them he beat you for no reason at all?

A. I don't remember writing that.

4. As noted previously, Minor's brother also testified on behalf of the prosecution. He testified that, on May 12, 2002, he and his father went to pick up Minor after receiving a call from Minor. He observed that "[t]here was a small lump on one of [Minor's] . . . cheekbone."

Q. If I were to show you your written statement, would it help to refresh your memory on what you told the police?

A. Yeah.

[Defense Counsel:] Your Honor, I'd like to show the written statement of the complainant to—

Q. Does that help you to remember what you told the police?

A. Yeah.

Q. Let me ask you again, do you remember telling the police that he kicked you for no reason?

A. No.

Q. You also told the police that he only hit you once, correct?

A. No.

Q. I believe you told the police he choked you and he hit you—

. . . .

Do you remember you telling them he choked you?

A. The police, yeah.

Minor reiterated that Roman kicked him twice. Defense counsel then proceeded to ask Minor the following:

Q. [By Defense Counsel:] Isn't it true that you go out in the yard when you were living at your home, and beat the trees?

[The Prosecution:] Objection, your Honor, relevance.

THE COURT: Beat the what?

[Defense Counsel:] The trees in the yard, your Honor. He would go out and beat them with a stick.

[The Prosecution:] Again, your Honor, object on relevance.

[Defense Counsel:] Your Honor, [indiscernible] state of mind.

. . . .

THE COURT: Okay, we'll allow it.

. . . .

Q. Did you used to go out in the yard and beat the trees with a stick?

A. Yes.

Q. And did you beat those trees so much that the trees died?

A. No.

Q. Did you use[ ] to kill chickens?

[The Prosecution:] Objection, your Honor, relevance. Where is this going?

THE COURT: Yeah, I think we, we talked about this one time about the defense of self defense. Is that what we're getting at?

[Defense Counsel:] Yes, your Honor.

THE COURT: We'll see, continue, you may continue.

Q. Did you used to kill chickens?

A. Yes.

Q. And did you take a glue stick, a hot glue stick, to a friend's arm to burn him?

A. Yes, 'cause he burnt me.

Q. In fact, haven't you in the past been taken for counseling on many occasions by your mother's boyfriend, Al Roman, because of your violent tendencies and your unusual behavior?

[The Prosecution:] Objection, your Honor, relevance. This is not—

THE COURT: I'm going to sustain the objection, yeah. I'm wondering whose on trial here at this point.

On redirect examination, Minor again stated that, after Roman's second request that Minor grate the cheese, Minor did as he was told but Roman "didn't like the way that [Minor was] doing it." When asked how Mother would discipline him if he misbehaved, Minor responded that:

A. [By Minor:] She would spank me.

Q. [By the Prosecution:] And where would she spank you?

A. My ass.

Q. Did she ever kick you?

A. No.

Q. Did she ever slap you on the face?

A. No.

### 2. Police Officers' Testimony

Officer Bolos testified that, on May 12, 2002, he responded to a domestic abuse call coming from Roman's residence. He stated that he spoke with Roman and Mother, who told him that they had been arguing. Officer Bolos did not speak to Minor and testified that Minor had already left by the time he

arrived at the residence. He further indicated that he closed "the miscellaneous public bulletin" because he "didn't feel a case needed to be made being that [Mother] told [him] that everything was okay between [her] and [Roman]."

Officers Matsumoto and Saludares testified that, on the day of the incident, they responded to a domestic abuse call made from Minor's father's residence. Officer Matsumoto stated that, when she arrived at the residence,

> [Minor] was in the garage area. Apparently he was upset. I observed that his facial area was red but there was no bruising. Apparently, he was allegedly struck in the face several times by his mother's, I believe, boyfriend, Alfred Roman. I asked him if, uh, if he needed any kind of medical assistance, uh, or anything, he said, no, he didn't.

Officer Matsumoto did not notice any swelling to Minor's face. On cross-examination, defense counsel asked Officer Matsumoto, "when you saw the redness to the face, you did not know whether it was an injury or not, correct?" Officer Matsumoto responded in the affirmative and further agreed with defense counsel that Minor was "fair skinned" and "had a red complexion."

Officer Saludares also testified that, when he spoke to Minor, he observed that Minor "had some redness on his face" and "scratches on his front neck area." Officer Saludares and the prosecution then entered into the following colloquy:

> Q. [By the Prosecution:] What was [Minor's] demeanor?
>
> A. [By Officer Saludares:] [Minor] spoke to me in a quieter lower tone, appeared to be a little afraid. Just trying to think of a way to describe it but afraid in a way. Not comfortable.
>
> Q. Was he afraid of you?
>
> A. No.
>
> Q. What made you think he was afraid?
>
> A. Um, from what he told me, the incident that occurred that night and, uh, just

his demeanor, the way that he spoke to me having a, a—when he was talking about the incident that night.

> Q. Was he upset?
>
> A. Yes, a little.
>
> Q. What was he telling you about the incident that night?
>
> A. Um, he informed me that, um, his mother's boyfriend had arrived home that night, he was intoxicated, at which time he had, uh, began yelling and swearing at [Minor] and had kicked him in his lower back area as well as began to choke him on the front of his neck area.
>
> Q. Officer, were you the lead investigator on this case?
>
> A. Yes.
>
> Q. And based on your observations of [Minor] and what he told you, what did you do?
>
> A. Well, I investigated further. We had took photographs of the injuries,[5] officers assisted in interviewing witnesses. I also, um, later made contact with the suspect[, i.e., Roman,] in the case and had advised him [of] his rights and obtained a statement.

On cross-examination, Officer Saludares testified that Minor was struck in the face once.

### 3. Roman's Testimony

Roman testified that he and Mother had been "boyfriend/girlfriend" since 1995 and that he treated Minor "like a step son." Roman explained that he

> moved in with [Mother] in 1995, this was in Ainaloa, uh, I owned my own home and we decided that after I was through with the problems I had with my ex-wife, that it was time for us to move in back to my home and we moved back in 1996, I believe it was, about a year later, uh, took care of [Minor] just like [he] was my own kid[.]

According to Roman,

> [i]t was Mother's Day.... I don't have a lot of money and it was Mother's Day and I know that [Mother], one of her favorite

---

**5.** It does not appear from the record that the photographs were admitted at the bench trial. In fact, neither the prosecution nor defense counsel made any mention of the photographs at trial.

foods, is tacos—[M]exican tacos so I decided to make a taco dinner for her as Mother's Day dinner.

. . . .

Okay, there's a—if I may say this, I had already gone to the store and returned before this incident even occurred. I had gone to the store, I had purchased what was necessary, I came back, after which I had to leave again but not until I had asked [Minor] if he could please grate the cheese and shred some lettuce that I had asked him before I left the second time.but I had done all my shopping as of that point already.

. . . .

Well, he—I bought him one of those walkman things and he was laying down in front of the television with his walkman just blaring and I didn't talk to [Minor] when I returned. I walked into the house and I walked over to the refrigerator and I looked into the ice box and I seen that the lettuce nor the cheese or any of that had even been touched. It was still in the original containers.

. . . .

I started calling [Minor].

. . . .

He did not respond because the stereo on his head was so loud.

. . . .

He was laying down, facing the TV, and I walked maybe from here to that desk away from him and I said, [Minor], and he turned and he looked at me and—

. . . .

You know, I said, [Minor], what about the cheese and he just kept staring at me, just staring, he just kept looking at me.

. . . .

I walked up to him, I kicked him in his okole.

. . . .

He spun around, he spun to his feet, uh, I had no idea what was on his mind. . . .

. . . .

. . . [and he stood there with a] clenched fist.

Um, honestly, I felt at that point that I had fully lost all control of [Minor] as far as being a friend and a member of the family.

. . . .

I started yelling at him and he kept looking at me, he kept looking at me and I finally said, [Minor], hey, what is this, I mean, you want to hit me, go ahead and hit me, and he stepped forward towards me and I slapped him. Your Honor, I slapped him across the cheek.

. . . .

I found myself—well, he kept—he still would not respond. There was absolutely no response from him and at first, I was going to call his father and have the father come and pick the boy up and take him to his home. And at that point, I said, no, I think this should be recorded so I made a phone call to the . . . [p]olice [d]epartment and I told them of the incident that had happened and if they could send some officers up as soon as possible at which time I went downstairs and sat in the patio until . . . the officers arrived.

Roman further testified that he "wanted to be noticed as the head of the household which has never happened with [Minor] for many, many years, which is why I never did physically, let me restate this, slap, hit, I have never even punished [Minor] in all the years that he was with me."

Defense counsel also inquired of Roman whether he had problems in the past with Minor; the prosecution objected, and the family court sustained the objection. Defense counsel, thereafter, asked Roman whether, "[i]n the past, when [he] had problems with [Minor, he] took [Minor] to therapy," to which the prosecution again objected. The family court indicated that, "with respect to therapy, the [c]ourt accept[ed] the fact that [Minor was] in therapy and, uh, did not find the fact that he's in therapy will provide an excuse or justification for [Roman's] conduct on that day." [6]

---

**6.** As discussed *infra*, Roman also challenges the ICA's conclusion that the family court's exclusion of certain evidence, assuming it was error, was nevertheless harmless. The excluded evidence

On cross-examination, Roman conceded that he drank a six pack between 2:00 p.m. and 6:30 p.m. on the day of the incident. The prosecution, thereafter, asked Roman:

Q. [By the Prosecution:] ... You testified that [you] kicked the victim to get his attention?

A. [By Roman:] I kicked him in his okole, yes.

Q. And you slapped him in his face?

A. And I slapped him in his face.

Q. Isn't it true you attempted to choke him?

A. I held him back at one point because I wasn't sure exactly what was on his mind[.]

Q. ... [I]sn't it true that [Minor's] mother had to intervene and pull you off of [Minor]?

A. No.

Q. Isn't it true that you called the police and you said, I just hit my girlfriend and my stepson?

A. Yes.

Q. And you said you did it because you, you were going to diffuse the situation?

A. I was trying to so—

Q. You were trying to diffuse the situation by kicking and slapping [Minor]?

A. No, no, no. I diffused the situation of the entire incident that happened. ...

Q. Isn't it true that [Minor] attempted to grate the cheese and you went and told him that he wasn't doing it right and you told him to go and sit down?

A. Absolutely not.

Q. Isn't it true that [Minor] did exactly what you told him to and he went and sat down?

A. He never was grating the cheese so why should I tell him to sit down?

On redirect examination, defense counsel asked Roman "why did [he] make the statement that [he] had just hit [his] wife or [his] girlfriend and [Minor]," to which Roman responded:

'Cause in my heart of hearts, I wanted this ended and I wanted it ended with the police and I wanted them to be there as witnesses for me of what I am trying to do in this situation that I believe it's time he leave the house and go live with his father, which is what the boy wanted to do for year—about a year before this because there is no discipline at the father's house.

### 4. Closing Arguments and the Verdict

During closing arguments, the prosecution contended that:

If, um, [Roman] even attempts to raise the parental discipline defense, one, I do not think it applies in this case. Um, the victim testified that[,] when his mother disciplines him, she spanks him on his rear end. She doesn't kick him in the back, she doesn't slap him in the face. Also, your Honor, if you take the age of the child, at the time 17 years old, um, I do not believe the misconduct of the child, if there is even any misconduct, he attempted to grate the cheese, [Roman] didn't like the way he did, [Roman] told him to go and sit down, he did exactly what he was told to do so I don't see any misconduct on the part of the child here.

Defense counsel, however, argued that:

Basically, your Honor, this is a fabrication of a child who does not want to be disciplined. At 17 years old, it's pretty hard to spank a child on the bottom. Mr. Roman was the man of the household, the head of the house, in essence, the parent. The [m]other was sleeping, he had asked the son to help with the meal. The son was defiant, refused to do what he was being asked. The son's face was red. His face was red today. He has a reddy complexion. Perhaps a small welt showed up but had Mr. Roman intended to hurt him, there would have been much more than a welt showing up.

. . . .

pertains to Roman's prior non-physical attempts to address Minor's misconduct, including evidence of Roman's decision to seek therapy for Minor, that would have been adduced from Mi-

nor's and Roman's testimony, as well as from defense witness Frederick Williams, Ph.D. (Dr. Williams), which the family court excluded based on relevancy.

... HRS § 703–309[ ] permits the use of physical force to punish a minor child for his or her misconduct and to deter that minor from future misconduct. A parent's use of physical force to punish or deter, therefore, is not subject to criminal liability provided it is reasonably related to the welfare of the minor and within the scope of allowable physical force under the [s]tatute. Although the use of physical force of the child rearing method may engender debate, it is an option parents are free to employ within the bounds of the [s]tatute. Your Honor, there was no evidence that night that the child was repeatedly beaten.... I would argue, your Honor, that this was just a measure of Mr. Roman trying to discipline [Minor] when he was defiant and refused to comply with his [request].[ 7]

On rebuttal argument, the prosecution again reiterated that, in its view, the parental discipline defense was inapplicable to the instant case, arguing that "kicking the child and slapping a child in the face is not reasonably related to his misconduct[.]"

Subsequently, the family court orally announced its factual findings—specifically that:

We have a situation where, um, both adults have had prior relationships and, uh, both adults meaning Mr. Roman and [Mother] and that they entered into a relationship with fairly grown children involved and, uh, it has been in such situations, a situation where people have to adjust to a whole lot and this adjustment process is quite difficult for everyone involved[.] Alfred Roman is a fairly large person and his manner and demeanor is quite masculine and I think he has that sense of being in charge sort [sic] to speak. The [c]ourt doesn't know [Mother] but the [c]ourt senses that she had custody of the [Minor] and the relationship between [Roman] and [Mother] necessarily involved [Minor]. Um, the [c]ourt also, uh, gained from the testimony that [Minor], uh, had some emotional problems, whether they're related to

the divorce or not, the [c]ourt doesn't know that, but he did have some problems and, uh, had to, had to be treated, perhaps, as a special needs type of person and, therefore, uh, was someone whose guidance and discipline had to take a different [indiscernible]—different in the sense that not the, not the usual, uh, upbringing and the [c]ourt also senses that Mr. Roman recognized this and took steps to take care of the situation and that's how we got Dr. Williams involved in this picture.... With respect to this particular day, ... that is the date of May 12, 2002, ... Mr. Roman, uh, wanted to have this special day for [Mother] and had expected that [Minor] would participate in this special occasion for [m]om and [m]om was asked to take it easy and rest and that the evening meal would be prepared by Mr. Roman and [Minor]. Um, *the incident that transpired, uh, was not, in the [c]ourt's estimation, an incident where there was misconduct on the part of [Minor].* I think Mr. Roman wanted him to—wanted [Minor] to participate in this special day for [m]other and, uh, wanted to have some kind of influence in providing [Minor] with some kind of incentive to help make this special day for [m]om and, uh, unfortunately, uh, thus intent to provide motivation and create a situation where, uh, mom is treated specially not only by Alfred Roman but also by [Minor]. Um, turned out to be a situation where Mr. Roman tried to gain control over the situation. It escalated to that point where we want you to take part and it got to a point where, uh, I'm going to make you take part in this situation. Um, with respect to, uh, what happened that day, uh, the [c]ourt recognizes that there are these many, many factors involved and I think the [c]ourt has pointed out that *we're dealing with a situation where [sic] not dealing with someone who has done something wrong, we're dealing with something, somebody who has not done something as requested for this special day.* In other words, you know,

7. It should be observed that, although the justification of self-defense was raised at the commencement of trial, the parties appeared to focus primarily upon the parental discipline defense by the end of trial. Indeed, as discussed *infra*, the family court also focused upon the parental discipline defense and, in fact, made no mention of the defense of self-defense.

there's not [indiscernible] you're a dishonesty [sic] or what, *it's just that inaction on the part of [Minor]* so I'm pointing that out because, uh, we come to the area of parental discipline where discipline is to correct misbehavior and, uh, as the [c]ourt sees it, *we're not in a situation where we're correcting misbehavior but we're trying to take control of the situation where we're not having cooperation.* Uh, now, the, uh, other aspect of this case, which the [c]ourt has alluded to when we talked about control, is that *at one point there was a kick, uh, that was to get attention, and at another point, there was a slap, uh, and that was, as the [c]ourt understands the—at least from one perspective, a reaction to what was deemed to be defiance.* Now, uh, whether the defiance justifies the slapping is a matter for the [c]ourt. *We know that at this point there was a high level of emotion. [Minor] was kicked, he stood up, he stared at Mr. Roman, he had his fists clenched, and Mr. Roman, uh, was also at a high pitch of emotion and took this to be a defiant child, probably with the head phones still on and blaring, and not giving heed to what Mr. Roman had expected and, uh, there was such a fever of emotion that Mr. Roman even said words to the effect that if you like, you can hit me or something to that effect, inviting a confrontation.* There may be justification for the reaction and at this point, we have, uh, Mother who is on the scene, and, uh, becoming part of what I'll relate to as a fracas that this physical confrontation and the [c]ourt is satisfied this confrontation involved three people, that it was physical, that there was a point that Mr. Roman put his hands on [Minor]'s neck, and there was a point where [Mother] also physically was man handled or struck by Mr. Roman.

(Emphases added.) The family court, thereafter, ruled that the parental discipline defense did not apply to the above facts because "[i]t was a situation where Mr. Roman tried to assert control over the situation and did not get his way." Consequently, the family court found Roman guilty of abuse of family or household members, reasoning that:

What the [c]ourt has noted is that [Roman] is not denying in any way that he had kicked, that he testified that he had kicked the child, and I won't call him a child, the 17 year old boy, and he had slapped the boy. Um, and the [c]ourt further finds that those actions were done in anger, first with respect to getting the child's attention and secondly, ... in reaction to the boy's defiance.

The family court sentenced Roman to, *inter alia,* two years probation and fifteen days imprisonment, thirteen days of which would be stayed pending the probationary period.[8] The family court entered its written judgment on December 26, 2003. Roman filed a timely notice of appeal on January 23, 2004. Roman's sentence was stayed pending appeal.

### B. *Appeal Before the ICA*

On appeal, Roman maintained that the family court erred in convicting him of abuse of family or household members because, *inter alia:*

(1) the [family] court was wrong to conclude that the parental discipline defense (HRS § 703–309(1)[ ] ) was inapplicable to the instant case; (2) [the prosecution] failed to negate Roman's parental discipline defense; [and] (3) the [family] court erred by excluding evidence of Roman's previous non-physical attempts to deal with Minor's "misconducts," which constituted a violation of Roman's constitutional right to present a defense[.]

SDO at 1–2.

On January 22, 2008, the ICA, in a 2–1 SDO, affirmed the family court's December 26, 2003 judgment, with Associate Judge Nakamura dissenting. Specifically, the ICA resolved Roman's above contentions as follows:

---

**8.** The family court also ordered Roman to (1) undergo a domestic violence intervention program; (2) submit to an alcohol abuse assessment, follow recommended treatment, and be subject to any requested random urinalysis screening for drugs and/or alcohol; and (3) not possess or consume alcohol during his probation period.

(1) The family court clearly erred by not applying the parental discipline defense in the instant case because Roman's testimony, however weak, inconclusive, or unsatisfactory, was probative of the fact that (a) Roman had parental authority over Minor, (b) the force at issue was employed with due regard for Minor's age and size, and (c) the force was reasonably proportional to the misconduct being punished and reasonably believed necessary to protect the welfare of the recipient. *State v. Stocker,* 90 Hawai'i 85, 95, 976 P.2d 399, 409 (1999); *see* HRS § 703–309(1); *State v. Crouser,* 81 Hawai'i 5, 10–11, 911 P.2d 725, 730–31 (1996).

(2) The family court's error in ruling that the parental discipline defense did not apply in the instant case was harmless because the [prosecution] provided sufficient evidence at trial to negate Roman's proffered parental discipline defense. Given Minor's version of events, there was substantial evidence to support a conclusion that Roman's kicking Minor in the lower back, making it sore; hitting him twice on the face, leaving redness, soreness, and a lump there; and choking Minor because Minor did not grate the cheese as instructed and then did not grate it as Roman wanted was not reasonably proportional to Minor's misconduct or reasonably believed necessary to protect Minor's welfare.

(3) Assuming[,] arguendo, the family court abused its discretion by excluding evidence, based on irrelevance, of Roman's previous non-physical attempts to deal with Minor's "misconducts" (Roman testified that he had never disciplined or even punished [Minor] prior to the incident), such error was harmless.

SDO at 2–3. The dissent, however, believed that the family court's failure to consider Roman's asserted parental discipline defense "affected [Roman's] substantial rights and was not harmless error." Dissenting Op. at 1. The dissent further opined that "the family court harmfully erred in excluding evidence of Roman's non-physical attempts to deal with previous incidents of misconduct by Minor [because t]his evidence was relevant, under the parental discipline defense, to wheth-

er the force used by Roman in this case was reasonably proportional to the misconduct being punished." *Id.*

The judgment on appeal was entered on February 11, 2008. Roman timely filed his application on May 12, 2008. As previously stated, this court heard oral argument on August 21, 2008.

## II. STANDARDS OF REVIEW

### A. Conclusion of Law

A [conclusion of law] is not binding upon an appellate court and is freely reviewable for its correctness. This court ordinarily reviews [conclusions of law] under the right/wrong standard. Thus, a [conclusion of law] that is supported by the [family] court's finding of fact and that reflects an application of the correct rule of law will not be overturned. However, a [conclusion of law] that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the court's conclusions are dependent upon the facts and circumstances of each individual case.

*State v. Reis,* 115 Hawai'i 79, 84, 165 P.3d 980, 985 (2007) (internal quotation marks, citations, and original brackets omitted) (format altered).

### B. Harmless Error

This court has stated that:

Error is not to be viewed in isolation and considered purely in the abstract. It must be examined in light of the entire proceedings and given the effect to which the whole record shows it is entitled. In that context, the real question becomes whether there is a reasonable possibility that error might have contributed to conviction. If there is such a reasonable possibility in a criminal case, then the error is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside.

*State v. Gano,* 92 Hawai'i 161, 176, 988 P.2d 1153, 1168 (1999) (internal quotation marks, citations, and original brackets omitted) (format altered).

## III. DISCUSSION

On application, Roman contends, *inter alia*, that the ICA, having concluded that the family court incorrectly declined to apply the parental discipline defense, erred in affirming the family court's December 26, 2003 judgment. Specifically, Roman believes that the ICA erroneously held that the family court's error was harmless based on its conclusion that the prosecution had adduced sufficient evidence at trial to negate the parental discipline defense beyond a reasonable doubt.

▉ As previously stated, Roman was charged with and convicted of the offense of abuse of a family or household members, in violation of HRS § 709–906. His conviction required proof beyond a reasonable doubt that: (1) he physically abused Minor; (2) he did so intentionally, knowingly or recklessly; and (3) Minor was a present or former family or household member of Roman's. *See* HRS § 709–906(1). Roman, however, believes that his use of force upon Minor was justified pursuant to the parental discipline defense under HRS § 703–309(1), which provides:

> The use of force upon or toward the person of another is justifiable under the following circumstances:
>
> (1) The actor is the parent or guardian or other person similarly responsible for the general care and supervision of a minor, or a person acting at the request of the parent, guardian, or other responsible person, and:
>
> (a) The force is employed with due regard for the age and size of the minor and is reasonably related to the purpose of safeguarding or promoting the welfare of the minor, including the prevention or punishment of the minor's misconduct; and
>
> (b) The force used is not designed to cause or known to create a risk of causing substantial bodily injury,[9]

disfigurement, extreme pain or mental distress, or neurological damage.

Based upon the plain reading of subsection (1), invocation of the parental discipline defense mandates that Roman

> make a showing that the record contained evidence to support the following elements: (1) he was a parent, guardian, or other person as described in HRS § 703–309(1); (2) he used force against a minor for whose care and supervision he was responsible; (3) his use of force was with due regard to the age and size of the recipient and reasonably related to the purpose of safeguarding or promoting the welfare of the minor, including the prevention or punishment of misconduct; and (4) the force used was not designed to cause, or known to create a risk of causing, substantial bodily injury, disfigurement, extreme pain or mental distress, or neurological damage.

*State v. Crouser*, 81 Hawai'i 5, 10–11, 911 P.2d 725, 730–31 (1996) (citation omitted). Further, the parental discipline defense was available to Roman "so long as *some* evidence was adduced, *no matter how weak, inconclusive, or unsatisfactory it might be*, which was probative of [the aforementioned elements]." *State v. Stocker*, 90 Hawai'i 85, 95, 976 P.2d 399, 409 (1999) (some emphases in original and some added) (internal quotation marks and citations omitted). Here, the ICA correctly concluded that the parental discipline defense was available to Roman and that the family court erred in failing to apply the defense

> because Roman's testimony, however weak, inconclusive, or unsatisfactory, was probative of the fact that (a) Roman had parental authority over Minor, (b) the force at issue was employed with due regard for Minor's age and size, and (c) the force was reasonably proportional to the misconduct being punished and reasonably believed necessary to protect the welfare of the recipient.

9.  HRS § 707–700 (1993) defines "substantial bodily injury" as bodily injury which causes:
    (1) A major avulsion, laceration, or penetration of the skin;
    (2) A chemical, electrical, friction, or scalding burn of second degree severity;
    (3) A bone fracture;
    (4) A serious concussion; or
    (5) A tearing, rupture, or corrosive damage to the esophagus, viscera, or other internal organs.

SDO at 2 (citations omitted). Indeed, at oral argument before this court, the prosecution conceded that the parental discipline defense applies in this case, but believed that it had carried its burden of disproving the defense beyond a reasonable doubt. As such, the issue turns to whether the ICA correctly held that the family court's error was nevertheless harmless because the evidence proffered by the prosecution was legally sufficient to disprove the defense of parental discipline. SDO at 2.

Roman contends that the ICA erred in its harmless error holding because the family court's

> failure to consider Mr. Roman's parental discipline defense amounted to a denial of [his] constitutional due process rights to present a defense, and to proof beyond a reasonable doubt....
>
> It is well-established, as a precept of constitutional as well as statutory law, that due process requires that the prosecution establish proof beyond a reasonable doubt of every element of the crime charged including that required to negative any non-affirmative defenses. The family court's erroneous disregard of Mr. Roman's defense eroded the [prosecution]'s burden to prove each fact necessary to establish Mr. Roman's criminal culpability in violation of his constitutional rights. Such an error, when it ends up precluding consideration of a defense by the trier of fact is not subject to harmless error review....
>
> ... Where, as in the instant case, the trier-of-fact is altogether precluded from considering a defense, it is not possible to conclude that such error might not have contributed to the conviction.

Additionally, Roman asserts that

> [t]he evidence adduced at trial shows that Mr. Roman's use of force met all of the requirements set forth in HRS § 703–309(1). Mr. Roman's use of force by kicking [Minor] in the butt to get his attention and slapping him on the face when [Minor] physically challenged him was reasonable considering [Minor] was seventeen years old, and the force was used as punishment of [Minor]'s disobedience and insolent defi-

ance of Mr. Roman's authority. It is undisputed that Mr. Roman's use of force at most caused [Minor] a little soreness in his lower back and redness and a small lump on his cheek for an unknown duration. Despite the family court's errors in excluding relevant evidence, as discussed above, the record shows that the elements of the defense were met and the [prosecution] did not disprove any of these facts beyond a reasonable doubt.

■ As discussed above, because Roman had met his burden with respect to the parental discipline defense, the burden then shifted to the prosecution to prove beyond a reasonable doubt that Roman's conduct did not come within the scope of parental discipline as prescribed in HRS § 703–309(1). *Stocker*, 90 Hawaiʻi at 95, 976 P.2d at 409; *see also Crouser*, 81 Hawaiʻi at 11, 911 P.2d at 731 ("the prosecution had the burden of disproving beyond a reasonable doubt the [parental discipline] evidence that was adduced, or proving beyond a reasonable doubt facts negativing the ... defense") (citation omitted). In other words, the critical inquiry is whether the prosecution presented sufficient evidence to negate Roman's parental discipline defense beyond a reasonable doubt, to which the ICA answered in the affirmative.

Recently, this court succinctly announced that

> the legislature, in creating the parental [discipline] defense law, recognized the right of parents to discipline their children; that right, however, is not absolute. In other words, *parents may be justified in physically disciplining their children, but such discipline must be with due regard as to the amount of force utilized and must be directed to promote the welfare of the child. The force used* must (1) *reasonably be proportional to the misconduct being punished and (2) reasonably be believed necessary to protect the welfare of the recipient. The means used to effect the discipline must also be reasonable. In determining whether force is reasonable, the fact finder must consider the child's age, the child's stature, and the nature of the injuries inflicted, i.e., whether the force*

*used was designed to cause or known to create a risk of causing substantial bodily injury, disfigurement, extreme pain or mental distress, or neurological damage given the child's age and size.* These required factors are obviously general in nature and, by their very terms, place a large amount of discretion with the courts to determine whether the actions of a parent fall within the parameters of parental discipline, as set forth in HRS § 703–309(1). Clearly, there is no bright line that dictates what, under all circumstances, is unreasonable or excessive corporal punishment. Rather, the *permissible degree of force will vary according to the child's physique and age, the misconduct of the child, the nature of the discipline, and all the surrounding circumstances.* It necessarily follows that the question of reasonableness or excessiveness of physical punishment given a child by a parent is determined on a case-by-case basis and is dependent upon the particular circumstances of the case.

*State v. Matavale,* 115 Hawai'i 149, 164–65, 166 P.3d 322, 337–38 (2007) (some emphases in original and some added) (citations omitted).

■ Here, the evidence demonstrates that, at the time of the incident, Minor was seventeen years old. Although he was a minor at age seventeen, Minor was hardly a child. Indeed, the family court stated, "I won't call him a child, the 17 year old boy[.]" The family court explicitly found that the instant case concerned

> *somebody who has not done something as requested for this special day.* In other words, you know, ... *it's just that inaction on the part of [Minor]* so I'm pointing that out because, uh, we come to the area of *parental discipline* where discipline *is to correct misbehavior* and, uh, as the [c]ourt sees it, *we're not in a situation where we're correcting misbehavior but we're trying to take control of the situation where we're not having cooperation.*

(Emphases added.) Based on the foregoing, the family court apparently believed that Minor's failure to grate the cheese as Roman requested, or failure to grate the cheese to Roman's satisfaction, was essentially an issue of "not having cooperation" as opposed to "misbehavior" or misconduct. The family court, therefore, concluded that the parental discipline defense did not apply. Curiously, however, the family court also described Minor as a "defiant child," based on Minor's "st[anding] up" and "star[ing]" at Roman with "his fists clenched," and that Roman's conduct in slapping Minor was a "reaction to the boy's defiance."

Characterizing Minor as being defiant but, at the same time, characterizing Minor's behavior toward Roman as simply demonstrating a lack of cooperation defies logic. Indeed, Roman asserted—before the ICA—that the family court's finding of Minor's lack of cooperation as not amounting to punishable misconduct "go[es] against common sense and the experience of any parent[.]" In our view, not cooperating with a defiant attitude and demeanor is "misbehavior," *i.e.,* misconduct, on the part of Minor as such behavior shows disrespect for parental authority. It seems natural that Roman, as one of the persons responsible for the general care and supervision of Minor, would view Minor's attitude and demeanor as misconduct that warranted discipline. In describing Roman's actions, the family court—having considered all of the evidence presented at trial—expressly found:

> [T]here was a kick, uh, that was to get attention, and at another point, *there was a slap,* uh, and that was, as the [c]ourt understands the—at least from one perspective, a reaction to what was deemed to be defiance.... We know that at this point there was a high level of emotion. *[Minor] was kicked, he stood up, he stared at Mr. Roman, he had his fists clenched,* and Mr. Roman, uh, was also at a high pitch of emotion and took this to be a defiance child, probably with the head phones still on and blaring, and not giving heed to what Mr. Roman had expected and, uh, there was such a fever of emotion that Mr. Roman even said words to the effect that if you like, you can hit me or something to that effect, inviting a confrontation.

(Emphases added.) Roman, thereafter, slapped Minor in the face. According to

Minor, Roman's discipline caused a little soreness in his lower back and redness and a small lump on his cheek for an unknown duration. There was no evidence of bruising or swelling; nor did Minor require medical attention. Further, there was no evidence to indicate any detriment to Minor's overall well-being or physical, emotional or psychological state. *See* HRS § 703–309(1)(b). Thus, considering the totality of the facts and circumstances, the force employed by Roman (1) was reasonably proportionate to Minor's defiant behavior towards Roman and (2) was reasonably believed to be necessary to discipline Minor for his defiant attitude and demeanor. Moreover, the degree of force used was "not designed to cause or known to create a substantial risk of causing bodily injury, disfigurement, extreme pain or mental distress, or neurological damage." HRS § 703–309(1)(b).

The discipline used by Roman was slightly less than that used by the defendant-father upon his seventeen-year-old daughter in *State v. Kaimimoku,* 9 Haw.App. 345, 841 P.2d 1076 (1992). In that case, the trial court found the father's use of force against his daughter unjustified under HRS § 703–309(1) (1985) and convicted the father of abuse of a family or household member. 9 Haw.App. at 348, 841 P.2d at 1078. Specifically, the father slapped his daughter on the face and punched her shoulder, leaving a scratch and a bruise, and causing some pain of unknown duration. *Id.* at 347–48, 841 P.2d at 1077–78. On appeal, the ICA reversed the father's conviction, finding that the force used was within the bounds afforded to the father as a parent. *Id.* at 352–53, 841 P.2d at 1080. Likewise, in *State v. Deleon,* 72 Haw. 241, 813 P.2d 1382 (1991), the defendant-father's conviction of abuse of a family or household member was reversed on appeal even though his use of force was more severe than that of Roman. There, the father struck his fourteen-year-old daughter with a folded belt six to ten times above her knees, causing pain lasting for an hour and a half, and bruises lasting for about a week. 72 Haw. at 242–43, 813 P.2d at 1383.

More recently, this court in *Matavale* held that the defendant-mother's used of force upon her fourteen-year-old daughter fell within the parameters of the justified parental discipline defense statute. 115 Hawai'i at 168, 166 P.3d at 341. In that case, the mother

> disciplined [her d]aughter for her continuously defiant behavior in refusing to answer [the m]other's questions and in lying to her. Specifically, [the m]other hit [the d]aughter with a plastic backpack because [the d]aughter refused to respond to [the m]other's questions[. The m]other hit [the d]aughter with a plastic hanger because [the d]aughter again refused to answer [her] questions[. The m]other [also] hit [the d]aughter once with the flat side of a small car brush and once with a plastic handle of a tool[.]

*Id.* at 167, 166 P.3d at 340. The daughter testified that,

> although she experienced some pain at the time of the incident, [the m]other was not hitting her hard. In fact, [the d]aughter indicated that, out of the four implements used by [the m]other, two of them (the flat side of the car brush and the plastic handle of the tool) did not hurt or did "not really" hurt and the other two (the backpack and the plastic hanger) only hurt between levels two and five (on a scale of one to ten with ten being "very painful").

*Id.* at 166, 166 P.3d at 339. The daughter's injuries consisted of a few small bruises that were visible for about a week. *Id.* Based upon the totality of the facts and circumstances, this court held that the force employed by the mother was reasonably proportionate to the daughter's defiant behavior towards her mother and was reasonably believed to be necessary to discipline the daughter and that the force used did not exceed the protection of HRS § 703–309(1). *Id.* at 165–66, 166 P.3d at 338–39.

In contrast, the ICA in *State v. Tanielu,* 82 Hawai'i 373, 922 P.2d 986 (App.1996),

> agreed with the trial court that the "viciousness of the attack [the] defendant was involved in severed any relationship between the use of force and the welfare of [the d]aughter which might be considered 'reasonable.' " [82 Hawai'i] at 381, 922 P.2d at 994 (some internal quotation marks

omitted). In that case, the defendant kicked his fourteen-year old daughter in the shin, slapped her six to seven times, punched her in the face five to ten times, stomped on her face, and pulled her ears after discovering that she, *inter alia,* violated his orders not to see her verbally and physically abusive eighteen-year-old boyfriend. *Id.* at 376–77, 922 P.2d at 989–90. The ICA held that, based on the number and nature of the slaps, punches, and kicks inflicted upon the daughter and the police officer's observation of the daughter's laceration and contusions, the family court did not err in rejecting the parental [discipline] defense. *Id.*

*Matavale,* 115 Hawai'i at 164, 166 P.3d at 337 (other citation omitted) (summarizing *Tanielu* ). Similarly, in *Crouser,* the defendant punished his girlfriend's fourteen-year-old daughter because she forged a school progress report by (1) hitting her across both sides of her face, (2) knocking her to the floor, (3) throwing her on the bed, and (4) hitting her bare buttocks with a plastic bat to the point where the bat broke. 81 Hawai'i at 8, 911 P.2d at 728. The daughter testified that she had a hard time sitting and felt dizzy for an hour or so, and her bottom was bruised, had a deep reddish-purple color, and hurt for a couple of weeks after the incident. *Id.* at 8–9, 911 P.2d at 728–29. This court affirmed the defendant's conviction of abuse of a family or household member because the force inflicted upon the daughter exceeded the permissible level of discipline. *Id.* at 12–13, 911 P.2d at 732–33.

Based upon the foregoing discussion, we do not believe Roman's discipline was excessive in light of Minor's age, his misconduct, and the comparatively mild physical force used by Roman.[10] In both *Crouser* and *Tanielu,* the injuries suffered by the minors were far more severe than Minor's injuries. The pain in those cases lingered for several weeks and were far more severe and intense than the "little sore[ness]" experienced by Minor. Furthermore, the nature of the injuries suffered by Minor in the instant case and the duration of any resulting pain were not nearly as severe as those described (1) in *Kaimimoku,* where the minor was slapped in the face and punched in the shoulder several times, leaving scratches and bruises and causing some pain of unknown duration, (2) in *Deleon,* where the minor was struck six to ten times above her knees with a folded belt, and (3) in *Matavale,* where the minor was struck several times with various instruments, leaving some small bruises. Yet, in those cases, the appellate court determined that the degree of force used did not exceed the boundaries of HRS § 703–309(1)(b). Here, no evidence was adduced that the degree of force employed by Roman caused bruising, swelling, or required medical attention. Consequently, Roman's discipline was not so excessive that it "severed any relationship between the use of force and the welfare of [Minor] which might be considered 'reasonable.'" *Tanielu,* 82 Hawai'i at 381, 922 P.2d at 994. The discipline used by Roman was reasonably proportionate to Minor's misconduct, *i.e.,* his defiant attitude and demeanor, and the discipline was necessary to punish Minor's misconduct. Therefore, we believe that, in light of the circumstances in this case, including the family court's expressed findings, the prosecution failed to disprove Roman's parental discipline defense beyond a reasonable doubt. Accordingly, we hold that a reasonable possibility exists that the family court's failure to apply the parental discipline defense might have contributed to Roman's conviction such that the error cannot be said to be harmless. *See Gano,* 92 Hawai'i at 176, 988 P.2d at 1168. Consequently, the ICA's harmless error holding cannot stand.[11]

**10.** We are mindful that, in determining whether the force employed by Roman was reasonable, consideration must be given to not only Minor's age and the nature of the injuries inflicted, but also to Minor's size. However, the record does not contain any evidence concerning Minor's size. Nevertheless, in light of Minor's minimal injuries, including evidence of no bruising, no swelling, nor the need for medical attention, we do not believe that the lack of evidence relating to Minor's size is fatal to the analysis. In fact, as discussed above, Minor was older than the minors involved in *Deleon* and *Matavale* who had suffered more severe injuries than Minor in this case. Indeed, in those cases, the stature of each of the minors at the time of the relevant incident was also unknown.

## IV. CONCLUSION

Based on the foregoing, we vacate the ICA's February 11, 2008 judgment and reverse the family court's December 26, 2003 judgment.

Concurrence by NAKAYAMA and ACOBA, JJ.

We concur in the result only.

**11.** As noted *supra* in note 6, Roman also contends that the ICA erred in concluding that the family court's exclusion of evidence relating to Roman's prior non-physical attempts to address Minor's prior incidents of misconduct was harmless beyond a reasonable doubt. However, Roman's contention need not be addressed inasmuch as the above discussion renders the contention moot.