253 P.3d 639

STATE of Hawai'i, Petitioner/Plaintiff–
Appellee

v.

Cedric K. KIKUTA,
Respondent/Defendant–Appellant.

No. 29445.

Supreme Court of Hawai'i.

June 8, 2011.

As Corrected Aug. 11, 2011.

Anne K. Clarkin, Deputy Prosecuting Attorney, for petitioner/plaintiff-appellee State of Hawai'i.

Summer M.M. Kupau, Deputy Public Defender, (Jon N. Ikenaga, Deputy Public Defender, on the brief) for respondent/ defendant-appellant Cedric K. Kikuta.

ACOBA and DUFFY, JJ., and Circuit Judge WILSON, assigned by reason of vacancy; with Circuit Judge WILSON concurring separately; and NAKAYAMA, J., dissenting, with whom RECKTENWALD, C.J., joins.

Opinion of the Court by ACOBA, J.

We hold that (1) an instruction on Hawai'i Revised Statutes (HRS) § 703–309 (1993) (parental discipline defense),[1] is not *per se* precluded by the fact that substantial bodily injury occurred; (2) as with other defenses, an instruction to the jury on the parental discipline defense must be given so long as there is some evidence in the record to sup-

1. HRS § 703–309 provides in relevant part as follows:

**Use of force by persons with special responsibility for care, discipline, or safety of others.** *The use of force upon or toward the person of another is justifiable under the following circumstances* :

(1) The actor is the parent or guardian or other person similarly responsible for the general care and supervision of a minor, or a person acting at the request of the parent, guardian, or other responsible person, and:

(a) The force is employed with due regard for the age and size of the minor and is reasonably related to the purpose of safeguarding or promoting the welfare of the minor, including the prevention or punishment of the minor's misconduct; and

(b) *The force used is not designed to cause or known to create a risk of causing substantial bodily injury,* disfigurement, extreme pain or mental distress, or neurological damage.

(Emphases added.)

HRS § 707–700 (1993) defines "substantial bodily injury" as bodily injury which causes:

(1) A major avulsion, laceration, or penetration of the skin;

(2) A chemical, electrical, friction, or scalding burn of second degree severity;

(3) *A bone fracture;*

(4) A serious concussion; or

(5) A tearing, rupture, or corrosive damage to the esophagus, viscera, or other internal organs.

(Emphasis added.)

port each element of the defense, no matter how weak, inconclusive, or unsatisfactory that evidence may be; and (3) an instruction on HRS § 707–712(2) (1993) (mutual affray) must be given along with an instruction on Assault in the Third Degree, HRS § 707–712(1),[2] if there is any evidence that the injury was inflicted during the course of a fight or scuffle entered into by mutual consent. Inasmuch as there was some evidence in the record to support an instruction on the parental discipline defense, such an instruction requested by Respondent/Defendant–Appellant Cedric K. Kikuta (Respondent) was required to be given to the jury by the Family Court of the First Circuit (the court).[3] Additionally, under the circumstances, it was necessary to provide the jury with a mutual affray instruction, along with the Assault in the Third Degree instruction, where there was some evidence that the injury was inflicted during a fight entered into by mutual consent.

Accordingly, the June 8, 2010 judgment of the Intermediate Court of Appeals (ICA) filed pursuant to its May 18, 2010 memorandum opinion,[4] vacating the court's October 1, 2008 Judgment of Conviction and Sentence for its failure to instruct the jury on the parental discipline defense is affirmed in part, but is vacated in part as to the lack of disposition regarding a mutual affray instruction. The case is remanded for retrial.

We emphasize that our holding in no way condones the use of illegal force against minors. As acknowledged by the legislature, " 'the line between physical abuse and appropriate parental discipline is a very subjective one. What one parent considers discipline may seem abusive to another.' " *State v. Ma-*

*tavale,* 115 Hawai'i 149, 161, 166 P.3d 322, 334 (2007) (quoting Sen. Stand. Comm. Rep. No. 2493, in 1992 Senate Journal, at 1121). However, because a defendant is "entitled to have the trier of fact consider a defense having any support in the evidence no matter how weak, inconclusive, or unsatisfactory the evidence involved[,]" *State v. Riveira,* 59 Haw. 148, 153, 577 P.2d 793, 797 (1978), we consider only whether there was *any* evidence in the record supporting an instruction on the parental discipline and mutual affray defenses. We need not consider, today, the merits of whether Petitioner's use of force crossed the " 'line between physical abuse and appropriate parental discipline,' " *Matavale,* 115 Hawai'i at 149, 166 P.3d at 334, but hold only that Petitioner was entitled to have the jury, not the court, consider those defenses under the circumstances of this case.

## I.

The following essential matters, some verbatim, are from the record and the submissions of the parties.

On October 9, 2007, Respondent was charged by written complaint with Assault in the Second Degree, HRS § 707–711(1) (Supp.2007).[5] On June 16, 2008, Respondent was convicted by a jury for Assault in the Third Degree.

*Complainant's Testimony*

Respondent's step-son Justin (Complainant) was fourteen years old at the time of the incident. As of that date, he had been living with his mother (Mother) and Respondent for approximately five years, and he and Respondent "never really got along." On

---

2. HRS § 707–712 provides:

    **Assault in the third degree.** (1) A person commits the offense of assault in the third degree if the person:
      (a) Intentionally, knowingly, or recklessly causes bodily injury to another person; or
      . . . .
      (2) *Assault in the third degree is a misdemeanor unless committed in a fight or scuffle entered into by mutual consent, in which case it is a petty misdemeanor.*
    (Emphasis added.)

3. The Honorable Rhonda A. Nishimura presided.

4. The majority memorandum opinion was issued by Associate Judges Daniel R. Foley and Alexa D.M. Fujise, with Chief Judge Nakamura dissenting.

5. HRS § 707–711 provides in relevant part:

    **Assault in the second degree.** (1) A person commits the offense of assault in the second degree if:
      (a) The person intentionally or knowingly causes substantial bodily injury to another;
      (b) The person recklessly causes serious or substantial bodily injury to another[.]

September 30, 2007, Complainant was sitting in the "game room" of his home watching video programs with his cousin Chad (Cousin), when Respondent entered and told Complainant to feed his dog. Complainant told Respondent that he "would do it in five minutes" and when five minutes had elapsed, he fed the dog and cleaned the dog's bowl. According to Complainant, Respondent then noticed a stain on the floor that the dog had made, and Respondent instructed Complainant to clean it up. When Complainant told Respondent that he "couldn't because it was a stain[,]" Respondent stated, "I bet I could get it out." [6] In response, Complainant answered, "I bet you not." Respondent then told Complainant that if Respondent was able to get the stain out, Complainant "was going to be grounded for a year." Complainant then told Respondent that if Respondent could not, Complainant "would get to kick [Respondent] in the leg" and Respondent said "okay." Respondent had recently had surgery on his leg and was walking with a cast that extended from his hip to the ball of his foot, with the aid of crutches.

When Respondent left the room, Complainant "slammed the door" because he "was mad[,]" thinking he was about to lose the bet since Respondent "works with carpet" and he "was pretty sure" Respondent "could get [the stain] out." Immediately after, Respondent "slammed the door back open, and ... pushed [Complainant]" and he "fell [ ] backwards into the glass door." When Complainant got up, Respondent "pushe[d Complainant] back down." Complainant then "grabbed the crutch" that had fallen on the floor. According to Complainant, he did so because he knew that Respondent could not run or walk without the crutches and Complainant "thought he could get away" by grabbing them.

Complainant explained that as he was holding the crutch "sideways" and about "to run on the side of [Respondent,]" Respondent pushed the crutch toward [Complainant] and punched [him] in the face five times[.]" When Complainant "got to his knees and

covered [his] head" because his "face hurt," Respondent "punched [him] on the back of [his] head [ ] two or three times." When asked to describe the force used, Complainant stated that the punches were "hard enough to break [his] nose" and that the same amount of force was used by Respondent when punching the back of Complainant's head.

Complainant subsequently noticed that his nose was bleeding and that his face was swollen. His nose stopped bleeding after about half-an-hour and healed in about a week. Complainant also stated that his teeth were chipped, and he had them fixed by his dentist. When Mother came home, he related what happened to her. Complainant, Cousin, and Mother "left the home and went "straight to K–Mart[,]" then "to church[,]" and after church, to the hospital where Complainant was treated for his injuries.

When Complainant was asked whether he had "ever act[ed] like [he] was going to hit [Respondent], he responded, "I don't think so[,]" or "[i]f I did, I didn't mean to." He explained, "I may have looked like I did, but I didn't actually do it." According to Complainant, he had tried to move past Respondent while holding the crutch, "but never towards him." However, Complainant conceded on cross-examination that "when he stood up with [the] crutch, ... [he] figured that [Respondent] thought [Complainant was] going to whack him with it."

*Cousin's Testimony*

At trial, Cousin testified that he was thirteen years old at the time of the incident and fourteen years old at the time of trial. Cousin related that he and Complainant were watching video programs when Respondent came in and told Complainant to feed the dog. After Complainant did so, Respondent came back into the room and "start[ed] complaining about [a] dog stain on the ground." Cousin stated that when Respondent told Complainant to clean it, Complainant said, "[Y]ou can since [Respondent] want[ed] to make a bet with [Complainant.]" Respon-

---

**6.** On cross-examination, Complainant testified that he remembered providing a written statement to a police officer in which he first stated

that he had told Respondent, "I bet you can't" get the stain out.

dent told Complainant that if he was able to remove the stain, Complainant would get "a year's grounding from T.V." and Complainant would get "nothing if he [won]." But then, Complainant said, "I get to kick you in the leg[,]" and Respondent said "all right."

After Respondent left the room, Complainant "slam[med] the door on [Respondent]." Respondent then opened the door, "limp[ed] in kind of quickly" and "lunge[d] at [Complainant.]" Complainant was "tackled into the [ ] sliding door" and the jalousies fell." As Complainant was trying to get off the sliding door, Respondent "hit[ ] him about four or five times in the face." Complainant "put[ ] his hands over his head . . . defensively[,]" and Respondent hit Complainant in the head "[m]aybe fifteen times."

Cousin related that Complainant then stood up, grabbed a crutch from the floor, and held it in a defensive manner. Respondent then told Complainant that he "should use the crutch against him and [ ] fight[,]" but Complainant "didn't do anything"; just "kind on like backing off." After the incident, Cousin noticed that Complainant's "face was swelled," and "teeth were chipped, and Complainant also "had a bleeding nose."

*Respondent's Testimony*

Respondent had been married to Mother for six years and met Complainant six years prior to trial, when Complainant was about eight years old. At the time of the incident he was living with Complainant, Mother, and Complainant's grandmother. He was the father figure in Complainant's life and Complainant called him "dad," and Respondent referred to Complainant as his "son." According to Respondent, he and Complainant had a "[f]ather and son relationship" and did "all kinds of stuff" together, including "fishing, camping, from box cars to go-carts, to even talking about how to drive a regular car." Respondent related that during the course of their relationship, he would sometimes have to reprimand Complainant.

Prior to the incident, Respondent "popped [his] Achilles" while playing basketball and went to the emergency room to be treated. Following surgery, Respondent's leg was wrapped in a cast which went from his hip to the ball of his foot. As a result, he was unable to place his toes on the ground, put any weight on his leg, or keep his balance and therefore, needed crutches to move around. Respondent explained that if he were to put any weight on his foot, he would stretch his Achilles tendon and his foot was already very tender.

As to the incident, Respondent explained that he entered the game room and asked Complainant to complete some chores, including feeding the dog and cleaning the dog's "mess." Complainant asked Respondent to "give [him] a few minutes," which Respondent did. After Complainant fed the dog, Respondent asked him to put away the dog food. Complainant then got "pretty mad and started slamming stuff[.]" Around that time, Respondent noticed a stain on the ground, which Respondent described as dog "diarrhea." He indicated that when he asked Complainant to clean it up, Complainant answered, "I can't get it up." When he told Complainant, "[Y]ou can," Complainant responded, "[Y]ou wanna bet?" Respondent told the Complainant that he would be grounded for a year if Respondent was able to remove the stain. Complainant then stated that if he won the bet, "he could kick [Respondent] in the leg" that had been operated on. When Respondent left the room to obtain supplies to clean the stain, Complainant "lost it" because Respondent normally grounded Complainant for the "whole length." Complainant then slammed the sliding glass door.

Respondent related when Complainant slammed the glass door it made him "upset because [Respondent] told [Complainant] many times [not to slam the door]" and he felt like Complainant had done that to "get back" at him. At that time, Respondent re entered the game room and called Complainant but Complainant did not answer or look at him. When he called Complainant a second time, Complainant again did "[n]othing" and "ignor[ed him]." After being ignored again, Respondent went up to Complainant and pushed him with two hands on his shoulders. Because Respondent "was off-balance," his crutches fell from under his arms, and as a result, Respondent "pushed [Com-

plainant] harder than [he] wanted to," causing Complainant to hit his head on the sliding door.

According to Respondent, Complainant then picked up Respondent's crutch with two hands, came up off the floor, and swung the crutch at him. Respondent "blocked [the swing] and [ ] hit him" two times, but was not aiming for Complaint's face. Respondent explained that he punched Complainant "to try to make him let go of th[e] crutch" and was not "aiming anywhere[,]" but "just reacting[.]" Respondent did not notice any injuries to Complainant's face, chipped teeth, or bleeding. After he struck Complainant, Respondent talked to him calmly and stated, "[W]hat makes you think you could stand up to dad, you know. Don't do that, you know."

## II.

In settling jury instructions, defense counsel asserted that Respondent had struck Complainant in self-defense and that Respondent was also entitled to a jury instruction on the parental discipline defense because the defense had "raised or provided a scintilla of evidence that would require [the] instruction [to] be given." Petitioner/Plaintiff–Appellee State of Hawai'i (Petitioner) argued that Respondent was precluded from asserting the parental discipline defense because Respondent had caused substantial bodily injury to Complainant. Defense counsel conceded that Respondent had caused Complainant substantial bodily injury, but argued that the issue of whether or not the force used against Complainant was designed to cause or known to create a risk of causing substantial bodily injury was a question for the jury.

The court declined to give an instruction on the parental discipline defense on the ground that the force used against Complainant had resulted in substantial bodily injury. The court stated that "in this particular case under [the] circumstances, there's no dispute that the force caused or resulted in substantially [sic] bodily injury, which is defined by statute[,] which includes the fracture[, s]o the [c]ourt will refuse [the parental discipline instruction] over objection by [Respondent]."

## III.

### A.

On appeal to the ICA, Respondent argued that the court erred in failing to instruct the jurors (1) on the parental discipline defense and (2) on whether the assault in the third degree occurred during the course of a fight or scuffle entered into by mutual consent, i.e., mutual affray. Respondent maintained that a defendant is "entitled to an instruction on any defense or theory of the defense supported by the evidence, 'no matter how weak, unsatisfactory, or inconclusive.'" (Quoting *State v. Auld*, 114 Hawai'i 135, 144, 157 P.3d 574, 583 (2007).) In order to invoke the parental discipline defense, a defendant is required to make a showing that the record contained some evidence supporting the following elements:

> (1) [the defendant] was a parent, guardian, or other person as described in HRS § 703–309(1); (2) [the defendant] used force against a minor for whose care and supervision he was responsible; (3) his [or her] use of force was with due regard to the age and size of the recipient and reasonably related to the purpose of safeguarding or promoting the welfare of the minor, including the prevention or punishment of misconduct; and (4) the force used was not designed to cause, or known to create a risk of causing, substantial bodily injury, disfigurement, extreme pain or mental distress, or neurological damage.

*State v. Miller*, 105 Hawai'i 394, 401, 98 P.3d 265, 272 (App.2004).

As to the first element of the parental discipline defense, Respondent asserted that "[t]he scope of HRS § 703–309 extends to, 'a parent or guardian or other person similarly responsible for the general care and supervision of a minor[.]" According to Respondent, "it was undisputed that [he] was [Complainant's] step-father … and that he basically raised [Complainant] as his own son."

As to the second element, Respondent maintained that it was undisputed that he, as Complainant's step-father, "was responsible for supporting, caring for and disciplining [Complainant]." Respondent pointed out that in fact, on the date of the incident,

Mother "had gone out, leaving [Respondent] to care for and supervise [Complainant]."

As to the third element, HRS § 703–309(1)(a), Respondent asserted that "there was evidence that [Respondent's] use of force was with due regard to [Complainant's] age and size and was reasonably related to the purpose of safeguarding or promoting [Complainant's] welfare, including the prevention or punishment of misconduct." Respondent noted that at the time of the incident, Complainant was "5′ 10″ to 6′ tall and weighed around 160 pounds" and Respondent "was 5′ 7″ tall and weighed approximately 185 to 190 pounds[ ]." [7] Moreover, "the description of the force employed varied ... from two to four to five punches to the face to five punches to the back of the head." Respondent urged that whether or not "this force was 'with due regard' to [Complainant's] age and size and 'reasonably related to the purpose of safeguarding or promoting' [Complainant's] welfare" was a question for the jury and to be determined "on a case-by-case basis." (Quoting *Matavale*, 115 Hawaiʻi at 165, 166 P.3d at 338.)

With respect to the fourth element, HRS § 703–309(1)(b), regarding whether the force used was designed to cause or known to create a risk of substantial bodily injury, Respondent argued that "HRS § 703–309 prohibits not the result of the force, but the degree of force which is employed." (Citing *Miller*, 105 Hawaiʻi at 399, 98 P.3d at 270.) He maintained that whether the nature of the force was either (1) designed to cause substantial bodily injury or (2) known to create a risk of substantial bodily injury is "a question of fact that should have been submitted to the jury, not a basis for [the] rejection of the instruction[.]"

As to the first prong of HRS § 703–309(1)(b), Respondent contended that there was testimony that the force used was not designed to cause substantial bodily injury as evidenced by his testimony that he had hit Complainant as a "reaction" to Complainant swinging a crutch at him, and not with a design to cause substantial bodily injury. As to the second prong, Respondent contended that it was "questionable whether he would have known that [by hitting Complainant], he was creating a risk of causing [Complainant] substantial bodily injury[,]" as evidenced by the testimony of Complainant's treating physician that "the nose bone was easily broken because it was a thin bone." According to Respondent, he "did not realize that the degree of force he used could so easily result in a broken nose."

In connection with his second argument, Respondent contended that his description of the incident at trial "provided an evidentiary basis by which the jury could have found that the Assault in the Third Degree occurred during a fight or scuffle entered into by mutual consent, i.e. mutual affray." Respondent asserted that such an instruction was supported by his testimony that he had pushed Complainant, that Complainant then picked up a crutch and swung it at him, and only then did he react by hitting Complainant. Respondent maintained that he was entitled to an instruction on mutual affray "so long as there was any support in the evidence for an instruction on the issue[,]" even if such an instruction "were deemed inconsistent with a defense of self-defense[.]"

### B.

In response to Respondent's argument regarding the parental discipline instruction, Petitioner contended that "by virtue of the nature of [Complainant's] injuries caused by [Respondent's] attack[,]" Respondent "was *per se* unable to support the parental discipline defense which proscribes force sufficient to cause serious bodily injury including fracture" under HRS § 703–309(1)(b). Although the previous argument was the only theory raised by Petitioner at trial to support its argument that Respondent was not entitled to a parental discipline defense instruction, Petitioner also argued on appeal that the force used was not reasonably propor-

---

7. It is noted that although Respondent maintained in his opening brief that he weighed approximately 185 to 190 pounds at the time of the incident, he testified that "[w]hen he had his cast on [he] gained about [twenty-two] pounds." It is unclear as to whether the 185 to 190 pounds included the twenty-two pounds which Respondent had gained, or whether Respondent had gained twenty-two pounds while he had his cast on and then lost it prior to trial.

tional to the alleged misconduct of Complainant, i.e., "slamming the glass door and giving [Respondent] 'attitude[,]' " "nor could it be supposed to be necessary to protect the welfare of [Complainant]" under HRS § 703–309(1)(a). (Citing *State v. Tanielu,* 82 Hawai'i 373, 381, 922 P.2d 986, 994 (App.1996) (noting that, there, the ICA upheld the trial court's denial of a parental discipline defense instruction, where the fourteen-year-old "daughter was punched (with a closed fist in the face), [and] slapped and kicked")). According to Petitioner, here, as in *Tanielu,* " 'the viciousness of the attack' ... severed any relationship between the use of force and the welfare of [Complainant] which might be considered 'reasonable.' " (Quoting *Tanielu,* 82 Hawai'i at 381, 922 P.2d at 994.) (Brackets omitted.)

In further support of its argument that the force used in this case was not reasonably proportional to Complainant's misconduct, Petitioner cited to *State v. Crouser,* 81 Hawai'i 5, 12–13, 911 P.2d 725, 732–33 (1996), where the defendant punished his fourteen-year-old daughter for forging a school progress report by hitting her across both sides of her face, knocking her to the floor, throwing her on the bed, and hitting across her bare buttocks with a plastic bat causing the bat to break. There, Petitioner noted, this court affirmed the defendant's conviction of abuse of a family member over the defendant's claim of a parental discipline defense, reasoning that the force used upon the daughter exceeded the permissible level of discipline. Additionally, Petitioner contended that "beating a person in the head with closed fists is known to create a risk of causing substantial bodily and/or neurological damage." (Citing *Miller,* 105 Hawai'i at 399, 98 P.3d at 270) (stating that "striking the victim about the head did create the risk of causing substantial bodily injury or neurological damage").

Finally, with respect to Respondent's argument regarding a mutual affray instruction, Petitioner urged that because no objection was made by Respondent at trial, this court should notice the error for "plain error," only if " '[the] erroneous instruction affected the substantial rights of [the] defendant.' " (Quoting *State v. Pauline,* 100 Hawai'i 356, 380, 60 P.3d 306, 330 (2002).) Also, Petitioner argued that even if Respondent was entitled to such an instruction, any error in that regard was harmless because "the jury convicted [Respondent] of an included offense (Assault in the Third Degree, misdemeanor) greater than the included offense (of petty misdemeanor Mutual Affray)[.]" (Citing *State v. Haanio,* 94 Hawai'i 405, 415–16, 16 P.3d 246, 256–57 (2001) (for the proposition that the court's failure to give an instruction on a lesser included offense "is harmless when the jury convicts the defendant of the charged offense or of an included offense greater than the included offense erroneously omitted from the instructions")).

## C.

### 1.

On May 18, 2010, the ICA filed its Memorandum Opinion. As to Respondent's argument that he was entitled to an instruction on the parental discipline defense, the ICA majority determined that the question was not, as the court concluded, whether the force used *resulted* in substantial bodily injury, but whether the force "was 'designed to cause or known to create a risk of causing' substantial bodily injury. HRS § 703–309(1)(b)." *State v. Kikuta,* No. 29445, 2010 WL 2017646, at *10 (May 18, 2010) (mem.) (citing *Miller,* 105 Hawai'i at 399, 98 P.3d at 270) (emphasis added). The ICA majority observed that "[a]ccording to the plain language of HRS § 703–309, what type and degree of force broke Complainant's nose and whether that force was designed to break his nose or known to create a risk of doing so was a question for the jury, as fact finder, to decide." *Id.* (citing *State v. Romano,* 114 Hawai'i 1, 8, 155 P.3d 1102, 1109 (2007) ("Matters of credibility and the weight of the evidence and the inferences to be drawn are for the fact finder.")).

The ICA majority determined that "[t]here is a question of fact as to whether [Respondent's] force against Complainant was designed to cause or known to create a risk of causing substantial bodily injury." *Id.* The majority reasoned that the point during the incident at which Respondent broke Com-

plainant's nose "is unclear" inasmuch as the "[e]vidence adduced at trial showed that [Respondent] pushed Complainant backward against a door jamb or glass door, allegedly tackled him twice, punched him in the face anywhere· from two to ten times, and allegedly punched him in the back of the head two or three times." *Id.* Because of the variance in testimony at trial, the majority believed that "even though [Respondent] caused Complainant to suffer substantial bodily injury, a jury may have found that [Respondent] did not use force that was 'designed to cause or known to create a risk of causing' substantial bodily injury." *Id.* (quoting HRS § 703–309(1)(b)). Consequently, the majority concluded that "the family court erred by not submitting the instruction on the parental discipline defense to the jury[,]" vacated Respondent's conviction, and remanded for a new trial. *Id.* The ICA majority "[chose] not to address" Respondent's argument regarding a mutual affray instruction. *Id.*

### 2.

The ICA dissent maintained that, as to the parental discipline instruction, there was insufficient evidence that the force employed by Respondent against Complainant (1) "was 'reasonably related to the purpose of safeguarding or promoting the welfare of [Complainant]'" or (2) "was not 'known to create a risk of causing substantial bodily injury, extreme pain or mental distress, or neurological damage.'" *Id.* at *11 (Nakamura, C.J., dissenting). As to (1), the dissent stated that Respondent's "acts of punching [Complainant] multiple times in the face and breaking his nose cannot be justified as being for the purpose of safeguarding or promoting [Complainant's] welfare." *Id.* According to the dissent, Respondent "did not testify that his use of force was done with the intent to safeguard or promote the welfare of [Complainant], or even to punish [Complainant] for his misconduct or prevent future misconduct. Instead, [Respondent] simply testified that he was 'upset.'" *Id.*

As to (2), the dissent stated that even if the nature of the conduct, and not the result of the conduct, is determinative in assessing whether the force used is permissible under HRS § 703–309(1)(b), "the nature of his conduct—a minimum of two punches to the face of [Complainant]—was clearly the type of conduct known to create a risk of causing substantial bodily injury, extreme pain, mental distress, or neurological damage." *Id.* at *12.

As to an instruction on mutual affray, the dissent stated that "mutual affray is 'a fight or scuffle entered into by mutual consent,'" *id.* (quoting HRS § 707–712(2) (1993)) (brackets omitted), and (a) Respondent "testified that he punched [Complainant] in self-defense without thinking and in reaction to [Complainant's] swinging a crutch at him," and (b) Complainant and Cousin testified that Complainant "did not attempt to swing the crutch at Respondent and did not take any aggressive action toward Respondent[,]" *id.* Thus, according to the dissent, "[t]here was no evidence that [Respondent] and [Complainant] had entered into a fight or scuffle by mutual consent." *Id.*

### IV.

On June 29, 2010, Petitioner filed an application for writ of certiorari (Application), urging this court to review the Memorandum Opinion of the ICA. Petitioner presents the following questions in its Application:

A. Whether the ICA gravely erred as a matter of law and fact in holding that the [ ] court should have submitted an instruction on a parental discipline defense to the jury[.]

B. Whether the ICA gravely erred in failing to find that the [ ] court did not commit plain error in failing to give a mutual affray instruction with respect to the lesser include offense of Assault in the Third Degree.

### V.

### A.

With respect to the first question, Petitioner maintains that because the requirements of HRS § 703–309 are set out in the conjunctive, rather than the disjunctive, a defendant "need only fail to fulfill any one element in order to fail to sustain the [ ] defense." (Cit-

ing *Crouser,* 81 Hawai'i at 13, 911 P.2d at 733.) Petitioner additionally raises similar contentions to those raised on appeal to the ICA. As to the first prong of the third element[8] of the parental discipline defense, HRS § 703–309(1)(a), Petitioner contended that Respondent failed to adduce evidence that the force employed was with due regard for the age and size of the minor. As to the second prong of the third element, Petitioner contended that the force used was "so excessive that it is no longer reasonably related to safeguarding the welfare of the minor[.]" (Citing *Crouser,* 81 Hawai'i at 12, 911 P.2d at 732.)

As to the fourth element, Petitioner argues that even if the nature of the force, as opposed to the result of the force, is determinative under HRS § 703–309(1)(b), " 'the nature of [Respondent's] conduct—a minimum of two punches to the face of [Complainant]—was clearly the type of conduct known to create a risk of causing substantial bodily injury, extreme pain, mental distress, or neurological damage.' " (Quoting *Kikuta,* 2010 WL 2017646, at *12 (Nakamura, C.J., dissenting).) Finally, Petitioner argues that even if "such instruction was warranted, the withholding of such instruction was harmless beyond a reasonable doubt in light of *Miller.*"

## B.

As to its second question, Petitioner argues that "there was no evidence adduced that [Complainant] consented to enter into a fight or scuffle with [Respondent]" as evidenced by (1) Respondent's testimony that (a) Complainant "was 'sitting on the ground watching a video' when [Respondent] pushed him[,]" and (b) Respondent later punched Complainant "without thinking[,]" and (2) the testimony of both Complainant and Cousin that Complainant "did not swing the crutch at [Respondent] or take aggressive action against him."

8. Petitioner did not raise contentions relating to the first or second element of the parental disci-

## VI.

■ As recounted, in the instant case, the court specifically refused the parental discipline instruction over objection by Respondent based on its finding that there was "no dispute that the force caused or resulted in substantially [sic] bodily injury[.]" " '[T]he fundamental starting point for statutory interpretation is the language of the statute itself. Where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning[.]' " *Kepoo v. Kane,* 106 Hawai'i 270, 285, 103 P.3d 939, 954 (2005) (quoting *Schmidt v. Bd. of Directors of Ass'n of Apartment Owners of Marco Polo Apartments,* 73 Haw. 526, 531–32, 836 P.2d 479, 482 (1992)) (ellipsis omitted).

■ The language of HRS § 703–309(1)(b) is unambiguous and precludes a defense instruction under that section if "the force used [was] [ ] designed to cause or known to create a risk of causing substantial bodily injury, disfigurement, extreme pain or mental distress, or neurological damage." The statute does not preclude the defense on the ground that force *resulted* in substantial bodily injury. If the legislature had intended that the result of the force used be determinative under HRS § 703–309(1)(b), it could have drafted HRS § 703–309(1)(b) to reflect that intent. The fact that HRS § 703–309(1)(b) makes no mention of a result of substantial bodily injury supports the conclusion that the nature of the force is the dispositive factor under that subsection.

■ Thus, under HRS § 703–309(1)(b), in some instances, criminal liability will attach to a defendant even though a defendant's use of force did *not* result in substantial bodily injury, so long as the force used by the defendant was designed to cause or known to create a risk of substantial bodily injury. *See Miller,* 105 Hawai'i at 401, 98 P.3d at 272 (affirming the family court's rejection of the defendant's parental discipline defense, based in part, on the family court's finding that although the force used on the minor did not

pline defense.

result in any serious injury, "striking the victim about the head did create the risk of causing substantial bodily injury or neurological damage"). Conversely, then, the defense instruction is not precluded if substantial bodily injury results, but the force used was not designed to cause or known to create a risk of substantial bodily injury. *Kikuta,* 2010 WL 2017646, at *10. Based on the foregoing, although acting conscientiously, the court erred in determining that Respondent was precluded from having the jury instructed on the parental discipline defense because the force used against Complainant resulted in substantial bodily injury. The plain language of the statute specifically ties the defense to criminal liability to the nature of the force used as opposed to the result of such use of force.

### VII.

#### A.

■ At trial, Petitioner did not challenge the sufficiency of the evidence adduced by Respondent in support of the elements of HRS § 703–309. Rather, as stated, Petitioner argued, and the court concluded, that the parental discipline defense was *per se* unavailable to a defendant, because substantial bodily injury resulted under HRS § 703–309(1)(b). Petitioner did not advance any arguments pertaining to HRS § 703–309(1)(a), as to welfare of the Complainant. Thus, any argument based on that subsection has been waived. *See State v. Rodrigues,* 67 Haw. 496, 498, 692 P.2d 1156, 1158 (1985) (stating that, "[a]t the trial level, the State[ ] . . . propounded only the theory of consent to the search in question" and therefore, "issues of exigency and a 'good faith' exception [ ] have been waived"). Implicit in the waiver is the well-settled maxim that "the failure to properly raise an issue at the trial level precludes a party from raising that issue on appeal." *State v. Hoglund,* 71 Haw. 147, 150, 785 P.2d 1311, 1313 (1990); *see also State v. Ildefonso,* 72 Haw. 573, 584, 827 P.2d 648, 655 (1992) ("Our review of the record reveals that [the defendant] did not raise this argument at trial, and thus it is deemed to have been waived." (Citing *State v. Cummings,* 49 Haw. 522, 423 P.2d 438 (1967).)); *Rodri-*

*gues,* 67 Haw. at 498, 692 P.2d at 1158 (holding that the State, "propound[ing] only the theory of consent to the search" at the trial level, had waived the theories "of exigency and a 'good faith' exception" because "[i]t is a generally accepted rule that issues not raised at the trial level will not be considered on appeal" (citation omitted)).

#### B.

■ Although Petitioner did not argue that Respondent was precluded from an instruction on the parental discipline defense under HRS § 703–309(1)(a), the ICA dissent and the dissent herein assert that Petitioner was not entitled to a parental discipline defense "because he did not strike [ ] Complainant for disciplinary reasons." Dissenting opinion at 100, 253 P.3d at 661. Like the ICA dissent, the dissent maintains that it may make this determination because " 'an appellate court may affirm the *judgment* of a trial court on any ground in the record that supports affirmance.' " *Id.* at 99 n. 1, 253 P.3d at 660 n. 1 (quoting *State v. Fukagawa,* 100 Hawai'i 498, 506, 60 P.3d 899, 907 (2002)) (brackets omitted) (emphasis added). The ICA dissent similarly concluded that "[t]he trial evidence did not support a claim that [Respondent's] use of force was 'reasonably related to the purpose of safeguarding or promoting the welfare of the minor,' a requirement for the parental discipline defense under HRS § 703–309(1)(a)." *Kikuta,* 2010 WL 2017646, at *11 (Nakamura, C.J., dissenting). Similarly, the dissent argues that "the force used [was] . . . so unreasonable as to take the issue of parental discipline away from the jury." Dissenting opinion at 101 n. 3, 253 P.3d at 662 n. 3. But, as discussed, that argument was waived by Petitioner and the court made no determination in that regard. Moreover, where, as here, there is a dispute in the evidence as to what occurred, the determination of liability under HRS § 703–309(1)(a) requires an assessment of the credibility of the witnesses and a weighing of the evidence. Such is not within the province of an appellate court, but a function of the fact finder at trial. Consequently, in this case, that issue is not to be resolved on appeal, but by the jury as the trier of fact.

■ Furthermore, we are reviewing a requested instruction that was foreclosed from jury consideration by the court. With respect to jury instructions, it is the duty of the trial court to ensure that the jury is properly instructed. *State v. Nichols*, 111 Hawai'i 327, 335, 141 P.3d 974, 982 (2006); *State v. Loa*, 83 Hawai'i 335, 358, 926 P.2d 1258, 1281 (1996) (stating that "the ultimate responsibility properly to instruct the jury lies with the circuit court and not with trial counsel" (quoting *State v. Kupau*, 76 Hawai'i 387, 395, 879 P.2d 492, 500 (1994))); *Haanio*, 94 Hawai'i at 415, 16 P.3d at 256 (stating that "in our judicial system, the trial courts, not the parties, have the duty and ultimate responsibility to insure that juries are properly instructed on issues of criminal liability"). Therefore, the foregoing language from Fukugawa is not applicable. However, because the ICA dissent and the dissent address HRS § 703–309(1)(a), although neither raised by Respondent nor considered by the court, we address both HRS § 703–309(1)(a) and (b) in turn.

### VIII.

It is well-established that a defendant is entitled to an instruction on a defense having any support in the evidence, no matter how weak, unsatisfactory or inconclusive the evidence might have appeared to the court. *Riveira*, 59 Haw. at 153, 577 P.2d at 797 (stating that the defendant was "entitled to have the trier of fact consider a defense having any support in the evidence no matter how weak, inconclusive, or unsatisfactory the evidence involved"); *State v. Santiago*, 53 Haw. 254, 271, 492 P.2d 657, 667 (1971) (stating that because the defendant's "testimony fairly raised the issue of self defense[,] ... he was entitled to an instruction on that issue no matter how weak, unsatisfactory, or inconclusive the testimony might have appeared to the court"); *State v. Pavao*, 81 Hawai'i 142, 144, 913 P.2d 553, 555 (App. 1996) (" '[T]he defendant in a criminal case tried before a jury is entitled to an instruction on every defense or theory of defense

having any support in the evidence, no matter how weak, inconclusive or unsatisfactory the evidence may be.' " (Quoting *State v. Lira*, 70 Haw. 23, 29, 759 P.2d 869, 873 (1988)). (Brackets in original.)) In other words, here, "the parental discipline defense was available to [Respondent] 'so long as some evidence was adduced, no matter how weak, inconclusive, or unsatisfactory it might be, which was probative of the aforementioned elements.' " *State v. Roman*, 119 Hawai'i 468, 478, 199 P.3d 57, 67 (2008) (quoting *State v. Stocker*, 90 Hawai'i 85, 95, 976 P.2d 399, 409 (1999)) (brackets and emphasis omitted).

### A.

■ With respect to HRS § 703–309(1)(a), Respondent did adduce some evidence that the force "was employed with due regard for the age and size of the minor and is reasonably related to the purpose of safeguarding or promoting the welfare of the minor, including the prevention or punishment of the minor's misconduct[.]" Complainant testified at trial that he was fourteen at the time of the incident. As of the date of trial, he was six-feet tall, but at the time of the incident, he "was a couple inches shorter." He also indicated that he weighed a hundred sixty pounds both at the time of trial and at the time of the incident.[9]

Based on Respondent's description of the force, i.e., a shove to Complainant's shoulder while "he was off-balance" and two punches not aimed at Complainant's face while one leg was in a cast and he was "unable to put any weight on that leg[,]" it cannot be concluded as a matter of law that the degree of force employed against Complainant was excessive for the age and size of the minor. Because "the permissible degree of force [ ] var[ies] according to the child's physique and age, the misconduct of the child, the nature of the discipline, and all the surrounding circumstances[,]" that determination must be made by the jury. *Matavale*, 115 Hawai'i at 165, 166 P.3d at 338.

---

9. As indicated before, it is unclear exactly how much Respondent weighed at the time of the incident, although he asserted in his opening brief that he weighed between 185 and 190 pounds at that time. *See supra* note 7.

### B.

Additionally, there was some evidence under HRS § 703–309(1)(a) that the force was used for the purpose of the prevention of, or punishment for, Complainant's misconduct. As recounted, Respondent testified at trial that he was a "father figure" to Complainant and "cared about him[,]" "loved him" and "provided for him." On occasion, Respondent would need to discipline Complainant and "expect[ed Complainant] to listen to [him]." Respondent related that after he struck Complainant he talked to him calmly and stated, "[W]hat makes you think you could stand up to dad, you know. Don't do that, you know." Although Respondent did not expressly state that he had used force for the purpose of disciplining Complainant or to promote his welfare, it can be reasonably inferred from the circumstances.

In *Roman*, the defendant was charged and convicted for abusing the seventeen-year-old son of his girlfriend (the minor). 119 Hawai'i at 469, 199 P.3d at 58. The minor testified that the defendant kicked him in his "lower back" and "whacked [him a] couple times" in the face "with his hand[,]" after the minor had ignored the defendant's request for the minor to help him prepare a Mother's Day dinner. *Id.* at 470, 199 P.3d at 59. The family court concluded, *inter alia*, that " 'discipline is to correct misbehavior" and the use of force was not to " 'correct[ ] misbehavior but . . . to take control of the situation where [the defendant was] not having cooperation.' " *Id.* at 476, 199 P.3d at 65 (emphasis omitted).

This court found the foregoing conclusion "curious[ ]" since the family court had described the minor as a " 'defiant child,' based on [the m]inor's 'standing up' and 'staring' at [the defendant] with 'his fists clenched,' " and had also noted that conduct in slapping Minor was a "reaction to the boy's defiance." *Id.* at 480, 199 P.3d at 69 (brackets omitted). It was explained by this court that "[c]haracterizing [the m]inor as being defiant but, at the same time, characterizing [the m]inor's behavior toward [the defendant] as simply demonstrating a lack of cooperation defies logic." *Id.* In this court's view, "not cooperating with a defiant attitude and demeanor is

"misbehavior," i.e., misconduct, on the part of [the m]inor as such behavior shows disrespect for parental authority." *Id.* According to the *Roman* court, "it seem[ed] natural that [the defendant], as one of the persons responsible for the general care and supervision of [the m]inor, would view [the m]inor's attitude and demeanor as misconduct that warranted discipline." *Id.*

In the instant case, as Complainant's stepfather, Respondent was likewise responsible for Complainant's welfare, supervision, and general care. Based on Respondent's testimony of Complainant's acts of (1) slamming the glass door despite Respondent's warning not to do so, (2) ignoring Respondent when Respondent attempted to talk to Complainant about such behavior, and (3) swinging a crutch at Respondent, the jury could have found that it would be "natural" for Respondent, "as one of the persons responsible for the general care and supervision of [Complainant], to view [Complainant's acts] as misconduct that warranted discipline." *Id.* Moreover, as in *Roman*, Respondent in fact stated that he had struck Complainant as "a reaction to what had just happened."

This court has acknowledged on another occasion that the fact that the use of force may have arisen out of anger or short temper, does not automatically mean that such force was not reasonably related to the purpose of safeguarding or promoting the welfare of the minor, or for the prevention or punishment of misconduct. In *Matavale*, this court explained that

> [the] protection for parents [afforded by the parental discipline defense] should *exist even if the parent acts out of frustration or short temper.* Parents do not always act with calmness of mind or considered judgment when upset with, or concerned about, their children's behavior. Nor do parents always act pursuant to a clearly defined circumstance of discipline or control. *A reaction often occurs from behavior a parent deems inappropriate that irritates or angers the parent, causing a reactive, demonstrative act.* Heat of the moment must not result in immoderate physical force and must be managed; however, *an angry moment*

*driving moderate or reasonable discipline is often part and parcel of the real world of parenting with which prosecutors and courts should not interfere.* What parent among us can say he or she has not been angered to some degree from a child's defiant, impudent, or insolent conduct, sufficient to call for spontaneous, stern, and meaningful discipline? *Matavale*, 115 Hawai'i at 166, 166 P.3d at 339 (internal quotation marks and citation omitted) (some emphases in original, some added).

The dissent maintains that any suggestion that parental discipline can occur reflexively or out of anger "is not persuasive [here]," because "this court has held that 'heat of the moment must not result in immoderate physical force and must be managed[.]' " Dissenting opinion at 100, 253 P.3d at 661 (quoting *Matavale*, 115 Hawai'i at 166, 166 P.3d at 339) (emphasis omitted). According to the dissent, because this court has not approved of two punches to a minor's face resulting in a broken nose and chipped teeth for parental discipline, Petitioner's "use of force therefore was not moderate or 'reasonably related' to the Complainant's welfare." *Id.* at 100–01, 253 P.3d at 661–62.

■■■■ Preliminarily, it must be made clear that our holding today does not "approve," as the dissent suggests, of the type of force used by Respondent or of the resulting injuries to Complainant. Here, we must decide only whether the defense should have at least been considered by the jury; not whether Petitioner's use of force was ultimately justified under the defense. We hold only that there was at least some evidence in the record supporting an *instruction* on the defense. Furthermore, even under the dissent's citation to *Matavale*, "the question of reasonableness or excessiveness of physical punishment given a child by a parent is determined on a *case-by-case basis and is dependent upon the particular circumstances of the case.*" *Matavale*, 115 Hawai'i at 165, 166 P.3d at 338 (emphasis added). "[T]here is no bright line that dictates what, under all circumstances, is unreasonable or excessive corporal punishment. . . . [T]he permissible degree of force will vary according to the child's physique and age, the misconduct of the child, the nature of the discipline, and all the surrounding circumstances." *Id.*

■■■■ In a jury trial, whether the force employed by the defendant was "immoderate" or excessive is to be determined by the jury as the trier of fact. Where a defendant asserts the parental discipline defense in a jury trial, the court's duty is to consider whether the defendant has raised any evidence supporting the instruction, not to determine whether such a defense has merit— that is for the jury to decide. In a jury trial, where the evidence is disputed, the foregoing question must be answered by the jury. Obviously, here, the evidence was in dispute.

IX.

A.

■■ With respect to HRS § 703–309(1)(b), Respondent did adduce some evidence to support the two prongs set forth under that section. As to the first prong, regarding whether the force used was designed to cause substantial bodily injury, Respondent admitted that he had pushed Complainant on the shoulders with two hands while he was "off-balance" and therefore, "harder than [he] wanted to[.]" He had additionally testified that at the time of the incident, his leg was in a cast and he was "unable to put any weight on that leg." Respondent related that when he pushed Complainant, his crutches "fell down." Thus, Respondent was apparently without the assistance of his crutches when Complainant got up off the floor and, according to Respondent, swung a crutch at him. Respondent then hit Complainant two times "to try to make him let go of [the] crutch." Respondent further indicated that he was not aiming for Complainant's face, but just "reacted" and did not have time to think.

As described by Respondent, there was some evidence that the force used was not designed to cause substantial bodily injury, inasmuch as Respondent testified that he was unable to place any weight on the leg that was in a cast, hit Complainant as a

reaction to Complainant swinging a crutch at him, and was not aiming for Complainant's face. *See State v. Kaimimoku*, 9 Haw.App. 345, 347, 841 P.2d 1076, 1077 (1992) (holding that, where the minor had testified that the defendant had "with an 'open fist slapped her on her face' and 'whacked' her on her face 'with an open fist straight on and on the right side of her face'" and "punched her on her shoulders with a 'closed fist,'" the prosecution "did not satisfy its burden of disproving [the defendant's parental discipline] defense").

To conclude that Respondent struck Complainant with a design of causing substantial bodily injury would require this court to determine the credibility of the witnesses and weigh the disputed evidence presented at trial. However, those matters are within the sole province of the jury as the trier of fact. *See State v. Jhun*, 83 Hawai'i 472, 483, 927 P.2d 1355, 1366 (1996) ("In a jury trial, the jury is the trier of fact and, thus, is the sole judge of the credibility of the witnesses and the weight of the evidence.") (Citing *State v. Tamura*, 63 Haw. 636, 637–38, 633 P.2d 1115, 1117 (1981)). In deciding whether a defendant is entitled to an instruction on the parental discipline defense, the court must determine whether there was any evidence to support the defense, no matter how weak, unsatisfactory, or inconclusive that evidence may be. Because on appeal, we "will not attempt to reconcile conflicting evidence," *State v. Gabrillo*, 10 Haw.App. 448, 457, 877 P.2d 891, 895 (1994) (internal quotation marks and citations omitted), we cannot conclude as a matter of law that under the circumstances the force used by Respondent was designed to cause substantial bodily injury.

### B.

With respect to the second prong of HRS § 703-309(1)(b), regarding whether the force used was known to cause a risk of substantial bodily injury, again, the force used, under the circumstances described by Respondent, cannot be said to be of the nature and type of force that would necessarily be known to create a risk of substantial bodily injury as a matter of law. Whether or not two punches in this case creates a risk of substantial bodily injury requires consideration of the facts and circumstances. Such determination is something that requires "the fact finder [to] consider the child's age, the child's stature, and the nature of the injuries inflicted[.]" *Matavale*, 115 Hawai'i at 164, 166 P.3d at 337. Additionally, to reiterate, the permissible degree of force varies depending on all of the surrounding circumstances and is determined on a case-by-case basis. *Id.* at 165, 166 P.3d at 338.

In this case, for example, had the jury been instructed properly, it would be free to consider Respondent's testimony that (1) he reacted to Complainant swinging the crutch at him, (2) one of his legs was in a cast, (3) he could not place any weight on that leg, (4) he was without crutches, and (5) he was not aiming at Complainant's face. A jury may have concluded that under those circumstances, the force used by Petitioner was not of a nature known to create a risk of substantial bodily injury. Because of the disputed evidence, that determination was to be made by the jury; not by the court. In sum, because there was some evidence indicating that under the circumstances, the force used was not designed to cause or known to create a risk of substantial bodily injury, Respondent was entitled to have the parental discipline defense instruction given to the jury for it to make that determination.

### X.

The occasions upon which this court and the ICA have addressed the parental discipline defense have considered whether the prosecution had met its burden of disproving the defense beyond a reasonable doubt. *See e.g. Crouser*, 81 Hawai'i at 11, 911 P.2d at 731 (stating that "the prosecution had the burden of disproving beyond a reasonable doubt the justification evidence that was adduced, or proving beyond a reasonable doubt facts negativing the justification defense"). Most of those cases involved bench, i.e., non-jury trials, and therefore, the trial court acted as the trier of fact as well as the judge of the law. In these cases the parental discipline defense was considered by the trial courts and we properly reviewed all of the evidence consid-

ered by the trial court in order to determine whether there was substantial evidence to support the trial court's judgment of conviction despite the parental discipline defense. *See, e.g., Tanielu,* 82 Hawai'i at 378, 922 P.2d at 991 (stating that "[i]n determining whether to uphold the family court's decision," "the test is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of [the court as] the trier of fact") (internal quotation marks and citation omitted).[10]

Contrastingly, the instant case was a jury trial in which the parental discipline defense instruction was not given and, thus, not considered by the trier of fact. As said before, in denying the instruction, the court foreclosed the fact finder, in this case the jury, from considering evidence of such a defense. As noted previously, where the evidence is disputed and there is any evidence to support

the defense, the instruction must be given by the trial court in order to allow the jury to consider the defense. Additionally, to reiterate, on appeal it is not for the appellate court to reconcile conflicting evidence as to that defense; that is a function for the fact finder at trial. *Gabrillo,* 10 Haw.App. at 457, 877 P.2d at 895 (stating that "on appeal, this court will not attempt to reconcile conflicting evidence") (brackets, ellipsis, internal quotation marks, and citations omitted).

As elucidated, there was some evidence adduced in this case supporting each element of the parental discipline defense. Because we cannot know how a jury would have resolved conflicting evidence regarding the defense, there is a reasonable possibility that the court's error "might have contributed to [Respondent's] conviction such that the error cannot be said to be harmless beyond a reasonable doubt." *Roman,* 119 Hawai'i at 482, 199 P.3d at 71–72.[11]

---

**10.** Briefly noted, Petitioner argued that, in *Miller,* the ICA determined that strikes to the head creates a risk of causing substantial bodily injury. In *Miller,* the family court had concluded that "striking the victim about the head did create the risk of causing substantial bodily injury or neurological damage." 105 Hawai'i at 399, 98 P.3d at 270. The ICA explained, "While we may not agree with all of the purported principles of law promulgated by the family court in announcing its verdict, we need not ponder them all, for we conclude there was substantial evidence in any event to negate [the defendant's parental discipline] defense." *Id.* at 399–400, 98 P.3d 265, 270–71. *Miller* did not *ipso facto* establish in all cases that striking a complainant on the head creates a risk of causing substantial bodily injury so as to defeat the parental discipline defense. Rather, *Miller* concluded that there was substantial evidence adduced to support the family court's conclusion that the force used by the defendant *in that case* was " 'known to create a risk of causing substantial bodily injury[.]' " *Id.* at 402, 98 P.3d at 273 (quoting HRS § 703–309(1)(b)).

Petitioner apparently suggests that the court's failure to instruct the jury on the parental discipline defense was harmless because no juror would have concluded that the force used by Respondent did not create a risk of causing substantial bodily injury. However, as recounted, there was conflicting testimony in the instant case and "[i]t is for the ... fact-finder to assess the credibility of witnesses and to resolve all questions of fact[.]" *Id.* at 400, 98 P.3d at 271 (internal quotation marks and citation omitted). Moreover, each case is to be judged on its "cir-

cumstances." *See Matavale,* 115 Hawai'i at 165, 166 P.3d at 338.

**11.** We disagree with the dissent's assertion that the error in this case is harmless beyond a reasonable doubt. *See* dissenting opinion at 101, 253 P.3d at 662. The dissent suggests that the force used in this case was "excessive" compared to the force used in *Roman. Id.* at 101–02, 253 P.3d at 662–63. With all due respect, the dissent assumes the role of the trier of fact in this case, deciding whether, under the controverted evidence, Petitioner should prevail on the merits of the parental discipline defense. As stated before, we determine only whether there was any evidence in the record supporting an instruction on the defense. Having determined that there is, it is the jury's duty to decide whether the force used by Petitioner was too "excessive" under the circumstances. As observed before, because we should not weigh the merits of the defense in this case, and further, cannot know how the jury would have ruled thereon had it been properly instructed, the error cannot be said to be harmless beyond a reasonable doubt.

The dissent challenges the foregoing, asserting that in some cases the force used against a minor is "so unreasonable as to take the issue of the parental discipline defense away from the jury." Dissenting opinion at 101 n. 3, 253 P.3d at 662 n. 3. The example posited by the dissent is where a parent shoots a minor. In such a case, the court would conclude as a matter of law, that the defendant would not be entitled to the parental discipline defense. Clearly, the force used in this case was not similar to the shooting of a minor. To reiterate, in contrast to the foregoing example, it cannot be concluded that the nature of the

## XI.

### A.

As stated, Petitioner argues in its Application, that the ICA erred in failing to conclude that the court "did not commit plain error in failing to give a mutual affray instruction with respect to the lesser included offense of Assault in the Third Degree[.]" "'As a general rule, jury instructions to which no objection has been made at trial will be reviewed only for plain error.'" An error will be deemed plain error "'[i]f the substantial rights of the defendant have been affected adversely[.]'" Additionally, "'this [c]ourt will apply the plain error standard of review to correct errors which seriously affect the fairness, integrity, or public reputation of judicial proceedings, to serve the ends of justice, and to prevent the denial of fundamental rights.'" *Nichols,* 111 Hawai'i at 334, 141 P.3d at 981 (quoting *State v. Sawyer,* 88 Hawai'i 325, 330, 966 P.2d 637, 642 (1998)) (internal citations omitted). Hawai'i Rules of Penal Procedure (HRPP) Rule 52(b) additionally provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

As was explained in *Nichols,* 111 Hawai'i at 334, 141 P.3d at 981, this court has affirmed the use of the plain error standard of review for erroneous jury instructions. *Nichols* explained that in *State v. Eberly,* 107 Hawai'i 239, 112 P.3d 725 (2005), this court observed that "erroneous [jury] instructions may be grounds for reversal despite counsel's failure to object at trial" because "it is ultimately the trial court that is responsible for ensuring that the jury is properly instructed." *Nichols,* 111 Hawai'i at 335, 141 P.3d at 982. As described in Nichols, because it is the duty of the trial court to properly instruct the jury on the law, although "as a general matter forfeited assignments of error are to be reviewed under the HRPP Rule 52(b) plain error standard of review," "in the case of erroneous jury instructions, that standard of review is effec-

tively merged with the HRPP Rule 52(a) harmless error standard of review because it is the duty of the trial court to properly instruct the jury." *Id.* at 337, 141 P.3d at 984; *see also State v. Holbron,* 78 Hawai'i 422, 428, 895 P.2d 173, 179 (App.1995) ("[I]t is the duty of the trial judge to give appropriate instructions even if not requested by counsel."). It was thus explained that "once instructional error is demonstrated," this court "will vacate [the judgment of the court], without regard to whether timely objection was made, if there is a reasonable possibility that the error contributed to the defendant's conviction, i.e., that the erroneous jury instruction was not harmless beyond a reasonable doubt." *Id.*

### B.

As recounted, Petitioner argued on appeal that even if Respondent was entitled to an instruction on mutual affray, such error was harmless, because the court's failure to give an instruction on a lesser included offense "'is harmless when the jury convicts the defendant of the charged offense or of an included offense greater than the included offense erroneously omitted from the instructions[.]'" (Quoting *Haanio,* 94 Hawai'i at 415–16, 16 P.3d at 256–57.) However, mutual affray, HRS § 707–712(2), is not a lesser included offense of Assault in the Third Degree, but rather, a mitigating defense to Misdemeanor Assault in the Third Degree.

HRS § 701–115(1) (1993) provides in relevant part that "[a] defense is a fact or set of facts which *negatives* penal liability." (Emphasis added.) HRS § 707–712(1) sets forth the offense of Assault in the Third Degree. HRS § 707–712(2) provides that Assault in the Third Degree will generally be a "misdemeanor unless committed in a fight or scuffle entered into by mutual consent," in which case, it is "a petty misdemeanor." The commentary on HRS § 707–712 similarly explains that "Assault in the third degree . . . is treated as a misdemeanor[,]" but "is *reduced* to a petty misdemeanor if the harm is inflicted in a fight or scuffle entered into by mutual

force used by Petitioner was excessive or unreasonable as a matter of law in light of the disputed

evidence.

consent." (Emphasis added.) Thus, HRS § 707–712(2) "provide[s] *a defense which mitigates that crime from a misdemeanor to a petty misdemeanor* when the assault is committed during a fight or scuffle entered into by mutual consent." *State v. Coyle,* 71 Haw. 165, 167, 785 P.2d 1320, 1320 (1990) (emphasis added). In other words, mutual affray is a mitigating defense that reduces the offense of Assault in the Third Degree to a petty misdemeanor. *Cf. State v. Pinero,* 70 Haw. 509, 523–24, 778 P.2d 704, 714 (1989) (distinguishing the lesser-included offense of "Manslaughter" under HRS § 707–702(1)(a), that includes the same elements of murder except for a different state of mind, i.e. recklessly, from the "mitigating defense," HRS § 707–702(2), under which the "intentional [or knowing] killing of another while under the influence of a reasonably induced [extreme mental or] emotional disturbance" reduces murder to manslaughter (brackets in original)); *see also* HRS § 707–720 (Supp. 2008) ("In a prosecution for kidnapping, it is a defense which *reduces* the offense to a class B felony that the defendant voluntarily released the victim, alive and not suffering from serious or substantial bodily injury, in a safe place prior to trial.") (Emphasis added.)

It may be noted that Respondent was charged with Assault in the Third Degree. Hawai'i Jury Instructions Criminal (HAW-JIC) 9.21 relating to mutual affray Assault in the Third Degree states that "[w]hen an Assault in the Third Degree instruction is submitted to the jury, *the court must also submit a mutual affray instruction and special interrogatory* where there is any evidence that the fight or scuffle was entered into by mutual consent." (Emphasis added.) Accordingly, we hold that the court must submit a mutual affray instruction to the jury where there is any evidence in the record that the injury was inflicted during the course of a fight or scuffle entered into by mutual consent, as indicated in HAWJIC 9.21.[12]

**12.** "The introduction to the HAWJIC indicates that '[n]othing herein contained shall be construed as an approval by the Supreme Court of the State of Hawai'i ... of the substance of any of said instructions." *State v. Toro,* 77 Hawai'i

## C.

■ In the instant case, there was some evidence adduced that the injury to Complainant occurred in the course of a fight or scuffle entered into by mutual consent. The term "mutual consent" is not defined by statute and has not been defined by case law. We may " '[r]esort to legal or other well accepted dictionaries as one way to determine the ordinary meaning of certain terms [not statutorily defined].' " *State v. Kalama,* 94 Hawai'i 60, 63 n. 6, 8 P.3d 1224, 1227 n. 6 (2000) (quoting *State v. Chen,* 77 Hawai'i 329, 337, 884 P.2d 392, 400 (App.1994)) (brackets in original). The term "mutual" is defined as, *inter alia,* "reciprocal" or "belonging to two parties[.]" *Black's Law Dictionary* 1115 (9th ed. 2009). The definition of the term "consent" includes "[a]greement, approval or permission as to some act[.]" *Id.* at 346. Consent may be express, but may also be implied, defined as "[c]onsent inferred from one's conduct rather than from one's direct expression." *Id.; see also State v. Hanson,* 97 Hawai'i 71, 75, 34 P.3d 1, 5 (2001) ("Consent may also be implied 'from an individual's words, gestures, or conduct.' " (Quoting *United States v. Buettner–Janusch,* 646 F.2d 759, 764 (2d Cir.1981).)). A plain reading of HRS § 707–712(2), then, denotes that mutual affray requires both parties to have approved of, or agreed to, a fight or scuffle, whether expressly or by conduct.

In this case, although Complainant testified that he did not give Respondent permission to punch him, there was some evidence adduced from which Complainant's consent to affray may be implied. As recounted, Respondent testified that he pushed Complainant on the shoulders, while Complainant was sitting on the floor, after being ignored several times. Respondent testified that after his crutches fell from under his arms, Complainant picked up one and swung the crutch at him. It was at that time that Respondent hit Complainant. Complainant conceded on cross-examination that "when

340, 348, 884 P.2d 403, 411 (App.1994) (brackets in original). We nevertheless find HAWJIC's recommendation prudent in light of the foregoing discussion.

[he] stood up with [the] crutch, ... [he] figured that [Respondent] thought [he was] going to whack him with it."

Respondent's testimony that Complainant had swung the crutch at him is evidence from which it could be implied that, from that point, Complainant had impliedly consented to a fight or scuffle with Respondent.[13] Inasmuch as the testimony of Complainant and Respondent differ, it is not for this court to determine whether the testimony of one was more credible than the other. *See supra.* Because there was some evidence in the record as to that issue, the jury should have been instructed on mutual affray. *See* HAWJIC 9.21. Inasmuch as "it is the duty of the trial court to properly instruct the jury[,]" the judgment of conviction must be vacated, "without regard to whether timely objection was made," because "there is a reasonable possibility that the error contrib-

uted to [Respondent's] conviction" for misdemeanor assault in the third degree. *Nichols,* 111 Hawai'i at 337, 141 P.3d at 984.

### D.

With all due respect, the dissent is incorrect that "trial courts will be obligated to instruct the jury *sua sponte* on mutual affray even though that defense may have little or no application to the facts of the case." Dissenting opinion at 103, 253 P.3d at 664; *see also id.* at 103 n. 6, 253 P.3d at 664 n. 6. We are not suggesting, as the dissent asserts, that a court has an obligation to instruct the jury *sua sponte* on all available defenses. Rather, it is well established that a court must only instruct the jury on defenses which have support in the record, although that evidence may be "weak, inconclusive, or unsatisfactory[.]" *Riveira,* 59 Haw. at 153, 577 P.2d at 797.[14] Moreover, in this particu-

---

**13.** The dissent asserts that an instruction on mutual affray "was not supported by the evidence[.]" Dissenting opinion at 101–02, 253 P.3d at 662–63. According to the dissent, Complainant and Cousin testified that Petitioner was the aggressor and Complainant did not agree to enter into a fight with Respondent. *Id.* at 102, 253 P.3d at 663. First, the dissent disregards Respondent's testimony that Complainant picked up a crutch and swung it at him. Respectfully, in seemingly discrediting Respondent's testimony, the dissent determines credibility and weighs the evidence, something that is not within the province of an appellate court. *State v. Eastman,* 81 Hawai'i 131, 139, 913 P.2d 57, 65 (1996) ("An appellate court will not pass upon the trial judge's decisions with respect to the credibility of witnesses and the weight of the evidence, because this is the province of the trial judge.") Additionally, it would appear that the dissent would require an express statement by Complainant or Cousin that Complainant agreed to engage in a fight with Respondent. The dissent sets out several examples of when mutual consent to fight could be implied, *see* dissenting opinion at 102, 253 P.3d at 663, such as "gesturing to leave a bar, 'throwing down the gauntlet' [or] clearing the bench at a baseball game," *id.* In the same light, it can be inferred from Complainant's conduct of swinging the crutch at Respondent, that he impliedly consented to a fight or scuffle with Respondent. But whether this was in fact the case was for the jury.

**14.** According to the dissent, *State v. Stenger,* 122 Hawai'i 271, 226 P.3d 441 (2010), which held that the court erred in failing to *sua sponte* instruct the jury on the mistake of fact defense when the defendant requested a claim of right

instruction, *id.* at 276, 282, 226 P.3d at 446, 452, was "limited" by the concurring opinion which noted that the defense theory at issue in *Stenger* "formed the very heart of the defense case, rather than some nebulous, barely glimpsed theory on the margins[,]" *id.* at 297, 226 P.3d at 467 (Kim, J., concurring). Dissenting opinion at 103–04, 253 P.3d at 664–65; 103 n. 5, 253P.3d at 664 n. 5. First, we note that Judge Kim also signed the opinion of the court.

Second, the dissent's view of *Stenger* would have to be justified under the doctrine set forth in *Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977), also known as the "narrowest grounds" doctrine, under which the holding of a plurality opinion "may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." However, that doctrine has been discredited. *See, e.g.,* Adam S. Hochschild, *The Modern Problem of Supreme Court Plurality Decisions: Interpretation in Historical Perspective,* 4 Wash. U. J.L. & Pol'y 261, 281 (2000) (stating that even "[a]ccording to the [Court in *Nichols v. United States,* 511 U.S. 738, 114 S.Ct. 1921, 128 L.Ed.2d 745 (1994)], the narrowest grounds test proved easier to state than to apply"); Joseph M. Cacace, *Plurality Decisions in the Supreme Court of the United States: A Reexamination of the Marks Doctrine After Rapanos v. United States,* 41 Suffolk U.L.Rev. 97, 101 (2007) (describing the two main "competing approaches" to applying the doctrine); Mark Alan Thurmon, *When the Court Divides: Reconsidering the Precedential Value of Supreme Court Plurality Decisions,* 42 Duke L.J. 419, 429 (1992) (stating that neither of the two main justifications for the *Marks* doctrine provides a supportable basis for it and that the

lar case, we only confirm what already exists, for HAWJIC 9.21 declares that the court must give a mutual affray instruction when instructing on Assault in the Third Degree. Accordingly, we see no problem, as the dissent does, with requiring an instruction on mutual affray where the jury is instructed on Assault in the Third Degree. *See* dissenting opinion at 103 n. 6, 253 P.3d at 664 n. 6. Furthermore, because there is at least some evidence in the record supporting such an instruction, HAWJIC 9.21 applies, and because this case will be retried, there is no reason why the jury should not be instructed on that defense.

## XII.

Therefore, the October 1, 2008 Judgment of Conviction and Sentence filed by the court is vacated. The ICA's June 8, 2010 judgment is affirmed in part and vacated in part and the case remanded for retrial on the grounds set forth herein.

Concurring Opinion by Circuit Judge WILSON, in place of MOON, C.J., recused and retired.

I agree with the opinion of Associate Justice Acoba and thus have signed it. I concur not to limit what is stated in that opinion, but to add to the justification for remand of the case for a new trial.

This case presents the question whether twelve citizens representing our community as jurors are barred as a matter of law from deciding whether a stepfather (Respondent/Defendant–Appellant Cedric K. Kikuta (Defendant)) exercised parental discipline when he pushed his fourteen-year-old stepson (Justin) into a glass door and struck him in the face. Trial judges are rightfully adverse to the notion that judges should substitute their values for those of jurors by barring a defense requested by a defendant. It is beyond cavil that the right to a jury trial is paramount among those rights enjoyed by individual citizens. It is said that the individ-

ual citizen's right to a jury of peers is the greatest protection we have from unlawful government action:

> The guarantees of jury trial in the Federal and State Constitutions reflect a profound judgment about the way in which law should be enforced and justice administered. A right to jury trial is guaranteed to criminal defendants in order to prevent oppression by the Government. Those who wrote our constitutions knew from history and experience that it was necessary to protect against unfounded criminal charges brought to eliminate enemies and against judges too responsive to the higher authority. The framers of the constitutions strove to create and independent judiciary but insisted upon further protection against arbitrary action. Providing an accused with the right to be tried by a jury of his peers gave him an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge.

*Duncan v. Louisiana,* 391 U.S. 145, 155–56, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968).

In this case, the trial judge deprived Defendant of the right to present his defense and, thus, his right to a fair trial. A requested instruction is to be given where, as here, there is any evidence to support the defense. On cross examination the prosecutor established that Defendant acted as a father figure, who exercised discipline against Justin on the day of the incident because he did not clean up a rug stain from the dog, slammed the door in anger, did not listen, and gave attitude. The prosecutor's questioning established that the argument between Defendant and Justin was about discipline. Defendant threatened to ground Justin for a year. And he admitted he pushed Justin's shoulders while he was sitting on the ground watching the computer and eventually struck him because he was teaching him not to stand up to "dad": "I was like, what makes

---

*Marks* court "misconstrued prior precedent and inadequately considered the problematic nature of plurality decisions"). More importantly, the doctrine has been applied very rarely and inconsistently by the Supreme Court. *See, e.g., Nich-*

*ols,* 511 U.S. at 745, 114 S.Ct. 1921 ("We think it not useful to pursue the *Marks* inquiry to the utmost logical possibility when it has so obviously baffled and divided the lower courts that have considered it.").

you think you could stand up to dad, you know. Don't do that, you know."

Cases cited by the dissent support the proposition that Defendant should not have been stripped of his right to have the jury consider his defense. In *State v. Crouser*, 81 Hawai'i 5, 911 P.2d 725 (1996), the defense asserted, and the court, as trier of fact, considered the parental discipline defense where the defendant hit her fourteen-year-old daughter twenty-five times on the buttocks and hands with a plastic bat so hard she was unable to sit, and hit her across both sides of the face with sufficient force to knock her to the floor. In *State v. Miller*, 105 Hawai'i 394, 98 P.3d 265 (App.2004), the trier of fact considered the defendant uncle's asserted parental discipline defense where he hit his eleven-year-old nephew with fists five times, kicked him, pulled him up by the ear and hair and gave him sufficient injuries that he was taken to the hospital by ambulance. The defense was also considered by the trier of fact in *State v. Tanielu*, 82 Hawai'i 373, 922 P.2d 986 (App.1996), where the defendant father kicked his fourteen-year-old daughter in the face five to ten times, slapped her six or seven times and punched her one or two times. The parental discipline defense was asserted and considered by the trier of fact in all three cases, notwithstanding the force exercised by the defendants.[1]

Defendant's right to a fair trial was further compromised after the court denied his request for a parental discipline instruction. Barred from asserting and having the jury consider his chosen defense, Defendant was limited to arguing only self defense to the jury. Yet, during closing argument the prosecutor advised the jury to reject Defendant's contention that he acted in self defense because his true intent was not to protect himself, but rather to discipline Justin. Specifi-

cally the prosecutor argued that Defendant exercised discipline when he became angry at Justin's attitude, particularly after Justin walked away and slammed the door. She emphasized that the incident took place because Defendant was going to "ground" Justin for a year, and the only way Defendant knew to "control" Justin was through anger. Her position was that Defendant did not act through self defense but as an angry father trying to control his son: "That person over there, his father, caused those injuries. He wasn't justified. There was no need for self-defense. He did it. He was angry and that's the only way he knew to control Justin." Legally barred from taking the very position argued by the prosecutor, Defendant's chosen defense was gutted.

Dissenting Opinion by NAKAYAMA, J.
with whom RECKTENWALD, C.J., joins.

I respectfully dissent. In my view, there was no evidence supporting a parental discipline defense instruction under Hawai'i Revised Statutes (HRS) § 703–309(1)(a) (1993). Additionally, the circuit court was not required to issue a special interrogatory on mutual affray *sua sponte*. Therefore, I would vacate the Intermediate Court of Appeals' (ICA) memorandum opinion and affirm Cedric K. Kikuta's ("Kikuta") conviction.

## A. Kikuta Was Not Entitled To a Parental Discipline Instruction Under HRS § 703–309(1)(a) and the Failure To Instruct the Jury On That Defense Was Harmless.

Under HRS § 703–309(1)(a), the "force employed" to discipline a child must be "reasonably related to the purpose of safeguarding or promoting the welfare of the minor, including the prevention or punishment of the minor's misconduct[.]"[1] Kikuta failed to

---

1. Each case was a bench trial.

1. Additionally, I disagree with the majority's conclusion that the prosecution waived this argument, because "[a]n appellate court may affirm a judgment of the lower court on any ground in the record that supports affirmance." *State v. Fukagawa*, 100 Hawai'i 498, 506–07, 60 P.3d 899, 907–08 (2002) (internal quotation marks omitted) (quoting *State v. Dow*, 96 Hawai'i 320, 326, 30 P.3d 926, 932 (2001)); *State v. Duncan*, 101

Hawai'i 269, 275, 67 P.3d 768, 774 (2003) (upholding the trial court's decision to exclude testimony on other grounds and noting that "we have consistently held that where the decision is correct it must be affirmed by the appellate court even though the lower tribunal gave the wrong reason for its action") (quoting *State v. Taniguchi*, 72 Haw. 235, 240, 815 P.2d 24, 26 (1991)).

The majority asserts that the circuit court did not address this argument and the argument was

adduce any evidence that he punched the Complainant in the face in order to discipline him. Kikuta testified that he punched the Complainant reflexively and did not think about what he did before he acted. He also testified that he punched the Complainant after the Complainant swung a crutch at him in order to force the Complainant to drop the crutch. Although Kikuta testified that after he punched the Complainant he said "what makes you think you could stand up to dad" and "[d]on't do that," his testimony established that he hit the Complainant reflexively to force him to drop the crutch. Even under Kikuta's version of the incident, he was not entitled to a parental discipline instruction because he did not strike the Complainant for disciplinary reasons.

The majority asserts that the Complainant misbehaved and that parental discipline can occur reflexively or out of anger. Majority opinion at 91–92, 253 P.3d at 652–53. This argument is not persuasive, because this court has held that *"[h]eat of the moment must not result in immoderate physical force* and must be managed; however, *an angry moment driving moderate or reasonable discipline* is often part and parcel of the real world of parenting with which prosecutors and courts should not interfere." *State v. Matavale,* 115 Hawai'i 149, 166, 166 P.3d 322, 339 (2007) (block quote formatting omitted) (emphasis added and omitted) (quoting *State v. Lefevre,* 138 N.M. 174, 117 P.3d 980, 984–85 (N.M.Ct.App.2005)). This court has also held that "the force used" must "reasonably be proportional to the misconduct being punished[,]" *id.* at 164, 166 P.3d at 337 (emphasis omitted) (citing *State v. Crouser,* 81

Hawai'i 5, 10–12, 911 P.2d 725, 730–32 (1996)), and that the "viciousness of the attack" can sever "any relationship between the use of force and the welfare of [a minor] which might be considered 'reasonable.'" *State v. Roman,* 119 Hawai'i 468, 481, 482, 199 P.3d 57, 70, 71 (2008) (some internal quotation marks omitted) (quoting *State v. Tanielu,* 82 Hawai'i 373, 381, 922 P.2d 986, 994 (App.1996)). Kikuta testified that the Complainant had misbehaved by failing to put dog food away, slamming a glass door shut, ignoring Kikuta, and swinging a crutch at Kikuta. However, even taking Kikuta's version of the event as true, his use of force was not proportional to the Complainant's misconduct. Kikuta pushed the Complainant into a glass door and punched him in the face hard enough to break his nose and chip his teeth. This severed the relationship between the force employed and the welfare of the minor. In *Matavale,* this court held that the force used by parents in *Crouser,* 81 Hawai'i at 8, 911 P.2d at 728 (minor testified that defendant hit minor in the face and struck her with a plastic bat until it broke), *Tanielu,* 82 Hawai'i at 376–77, 922 P.2d at 989–90 (defendant kicked his daughter in the shin, slapped her six to seven times, punched her in the face multiple times, stomped on her face, and pulled her ears), and *State v. Miller,* 105 Hawai'i 394, 396, 98 P.3d 265, 267 (App.2004) (minor testified that the defendant hit him five times with his fist and kicked him), "illustrate[s] the kind of conduct that clearly falls outside the parameters of parental discipline." 115 Hawai'i at 164 n. 11, 166 P.3d at 337 n. 11.[2] Likewise, this

---

waived. Majority opinion at 89, 253 P.3d at 650. However, the proposition that an appellate court can affirm a judgment on any ground in the record has not been predicated on raising an issue before the trial court. *See Fukagawa,* 100 Hawai'i at 506–07, 60 P.3d at 907–08; *Kiehm v. Adams,* 109 Hawai'i 296, 301 n. 13, 126 P.3d 339, 344 n. 13 (2005).

The majority also asserts that HRS § 703–309(1)(a) requires a determination of fact. Majority opinion at 89–90, 253 P.3d at 650–51. However, even assuming Kikuta's version of events is true, his use of force does not qualify as parental discipline under HRS § 703–309(1)(a). *See infra* at 99–101, 253 P.3d at 660–62.

**2.** The concurring opinion asserts that *Crouser, Miller,* and *Tanielu* "support the proposition that

Defendant should not have been stripped of his right to have the jury consider his defense." Concurring opinion at 99, 253 P.3d at 660. The concurring opinion observes that the "parental discipline defense was asserted and considered by the trier of fact in all three cases, notwithstanding the force exercised by the defendants." *Id.* at 3, 922 P.2d 986. However, in those cases, the appellate courts only determined whether substantial evidence supported the trial court's rejection of the parental discipline defense. *See Miller,* 105 Hawai'i at 402, 98 P.3d at 273; *Crouser,* 81 Hawai'i at 12, 911 P.2d at 732; *Tanielu,* 82 Hawai'i at 381, 922 P.2d at 994. Because those cases did not address whether a

court has not approved the use of a minimum of two punches to a minor's face resulting in a broken nose and chipped teeth for parental discipline, and Kikuta's use of force therefore was not moderate or "reasonably related" to the Complainant's welfare.[3]

Finally, the failure to give the parental discipline instruction was harmless because there was no reasonable possibility that Kikuta's actions qualified as parental discipline under HRS § 703–309(1)(a). *See Roman*, 119 Hawai'i at 477, 199 P.3d at 66 (quoting *State v. Gano*, 92 Hawai'i 161, 176, 988 P.2d 1153, 1168 (1999)). This conclusion is bolstered by this court's analysis in *Roman*, where this court held that the family court's failure to apply the parental discipline defense was not harmless. *Id.* at 482, 199 P.3d at 71. In so holding, this court paid close attention to the injuries suffered by the minor. For instance, this court noted that there "was no evidence of bruising or swelling; nor did Minor require medical attention." *Id.* at 481, 199 P.3d at 70. This court also noted that "there was no evidence to indicate any detriment to Minor's overall well-being or physical, emotional or psychological state." *Id.* (citing HRS § 703–309(1)(b)). In this court's discussion of other Hawai'i cases involving the parental discipline defense, it distinguished prior Hawai'i cases because "the injuries suffered by the minors were far more severe than Minor's

parental discipline defense instruction was required, they do not implicitly stand for that proposition. *See Chevron U.S.A., Inc. v. Workers' Comp. Appeals Bd.*, 19 Cal.4th 1182, 1195, 969 P.2d 613, 620, 81 Cal.Rptr.2d 521, 528 (1999) ("It is axiomatic that language in a judicial opinion is to be understood in accordance with the facts and issues before the court. An opinion is not authority for propositions not considered.").

3. At various points, the majority asserts that the dissent "assumes the role of the trier of fact in this case...." Majority opinion at 94 n. 11, 92, 253 P.3d at 655 n. 11, 653. This argument is not persuasive because this court has held that "a defendant is entitled to an instruction on every defense or theory of defense having any support in the evidence, *provided such evidence would support the consideration of that issue by the jury*, no matter how weak, inconclusive, or unsatisfactory the evidence may be." *State v. Locquiao*, 100 Hawai'i 195, 205, 58 P.3d 1242, 1252 (2002) (internal quotation marks omitted) (emphasis

injuries." *Id.* at 482, 199 P.3d at 71 (emphasis added). This court held that:

> *Here, no evidence was adduced that the degree of force employed by Roman caused bruising, swelling, or required medical attention. Consequently, Roman's discipline was not so excessive that it "severed any relationship between the use of force and the welfare of [Minor] which might be considered 'reasonable.'"* Tanielu, 82 Hawai'i at 381, 922 P.2d at 994. *The discipline used by Roman was reasonably proportionate to Minor's misconduct, i.e., his defiant attitude and demeanor, and the discipline was necessary to punish Minor's misconduct.* Therefore, we believe that, in light of the circumstances in this case, including the family court's expressed findings, the prosecution failed to disprove Roman's parental discipline defense beyond a reasonable doubt.

*Id.* (emphasis added).

Unlike *Roman*, the force employed by Kikuta was excessive and caused a broken nose and chipped teeth. Therefore, the parental discipline instruction was not warranted in this case.

**B. The Trial Court Did Not Plainly Err By Failing To Instruct the Jury *Sua Sponte* On the Defense Of Mutual Affray.**

I respectfully dissent from the majority's conclusion that the trial court reversibly

added) (quoting *State v. Hironaka*, 99 Hawai'i 198, 204, 53 P.3d 806, 812 (2002)). If the evidence adduced by the defendant does not support the consideration of the issue by the jury, the trial court is not required to instruct the jury as to that defense.

At some point, the force used is so unreasonable as to take the issue of the parental discipline defense away from the jury. For instance, if a parent shoots a minor and asserts the parental discipline defense, in my view, a trial court should not instruct the jury on the parental discipline defense because the evidence adduced does not create a jury question as to whether the use of that force was reasonably related to the discipline of a minor. *See* HRS § 703–309(1)(a). In this case, the two punches to the face of the Complainant resulting in a broken nose and chipped teeth exceeded that point, and therefore the circuit court properly refused Kikuta's request for a parental discipline defense instruction.

erred by failing to instruct the jury *sua sponte* on the mitigating defense of mutual affray. In my view, the trial court did not have a duty to instruct the jury *sua sponte* on a defense that was not supported by the evidence, not raised by Kikuta, and clearly peripheral to Kikuta's defense at trial.

The majority concludes that mutual affray is a *"mitigating defense"* that reduces the offense of Assault in the Third Degree to a petty misdemeanor" and that "[a]ccordingly, ... the court must submit a mutual affray instruction to the jury where there is *any evidence* in the record that the injury was inflicted during the course of a fight or scuffle entered into by mutual consent, as indicated in [Hawaiʻi Jury Instructions Criminal ("HAWJIC")] 9.21." Majority opinion at 95–96, 96, 253 P.3d at 656, 656–57 (emphasis added). The majority holds that there was "some evidence" supporting the mutual affray instruction because Kikuta testified that the Complainant swung the crutch at him and the Complainant may have impliedly consented to fight Kikuta. *Id.* at 47–48, 199 P.3d 57.

First, even assuming the "some evidence" standard applied to the mutual affray instruction in this case (as discussed below, it does not), Kikuta did not adduce any evidence supporting the defense of mutual affray. I agree with the majority that Hawaiʻi case law does not define the term "mutual consent" in this context and that mutual affray "requires both parties to have approved of, or agreed to, a fight or scuffle, whether expressly or by conduct." Majority opinion at 96, 96–97, 253 P.3d at 657, 657–58. In my view, under the foregoing standard, Kikuta did not adduce any evidence supporting this defense.

The majority asserts that Kikuta's testimony that he struck the Complainant after the Complainant attempted to hit him with a crutch supports the mutual affray defense. Majority opinion at 96–97, 253 P.3d at 657–58. However, Kikuta's testimony provides

no indication that the fight was entered into by mutual consent. Although Kikuta testified that the Complainant attempted to hit him with the crutch, the mere fact that a fight occurred does not evidence an agreement to fight. *See State v. Schroder,* 218 Neb. 860, 359 N.W.2d 799, 804–05 (Neb.1984) (holding that the trial court did not err by failing to consider whether the fight occurred during a mutual scuffle because the "mere fact that two persons engage in a fight does not mean that both consented to fight"). Kikuta failed to adduce any evidence of an agreement to fight between the Complainant and himself, and therefore was not entitled to assert the mutual affray defense.

The majority asserts that this opinion requires an express statement of an intent to fight. Majority opinion at 97 n. 13, 253 P.3d at 658 n. 13. However, holding that evidence of a fight alone does not warrant a mutual affray instruction does not foreclose the possibility of proving that a complaining witness impliedly consented to fight. For instance, gesturing to leave a bar, "throwing down the gauntlet," and clearing the bench at a baseball game, are all actions taken prior to a fight indicative of implied consent. Kikuta failed to adduce evidence that the fight was entered into by mutual consent, and therefore was not entitled to a mutual affray instruction.

Furthermore, Kikuta's description of the fight undermines his use of the mutual affray defense. Kikuta testified that he struck the Complainant reflexively in order to force the Complainant to drop the crutch. Nothing in Kikuta's testimony indicated an intent to engage the Complainant in a fight. The Complainant and his cousin testified that Kikuta was the aggressor, and that the Complainant did not agree to fight.[4] Neither version of the events is compatible with the mutual affray defense, which requires that both participants mutually consent to fight.

4. The majority asserts that this argument "disregards" Kikuta's testimony and weighs the evidence. Majority opinion at 97 n. 13, 253 P.3d at 658 n. 13. This argument is not persuasive because *neither* version of the events supports a

mutual affray instruction. Thus, weighing the evidence is not necessary to conclude that the mutual affray defense was not supported by the evidence.

Second, I disagree with the majority because this court has never held that a trial court must instruct the jury *sua sponte* as to all available defenses, even those on the periphery. For instance, in *State v. Stenger,* this court held that a trial court erred by failing to instruct the jury *sua sponte* on the mistake of fact defense when the defendant had requested a claim of right instruction. 122 Hawai'i 271, 276, 282, 226 P.3d 441, 446, 452 (2010); *Stenger,* 122 Hawai'i at 296, 226 P.3d at 466 (Kim, J., concurring) ("the defense had the theory right, but the specific instruction wrong"). The concurring opinion limited the majority's opinion by asserting that the "specter raised by Justice Nakayama's dissent of trial courts hereafter being responsible as a matter of law for combing through the entire body of evidence in search of every possible defense theory that may fit *is, in my view, not warranted by the specific holding of the majority in this case, based as it is on the specific facts of this case, especially where, as here, the theory at issue formed the very heart of the defense case, rather than some nebulous, barely glimpsed theory on the margins.*" *Id.* at 297, 226 P.3d at 467 (Kim, J., concurring); *see Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds ....' ") (quoting *Gregg v. Georgia,* 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)).[5] *Stenger* is distinguishable, because at Kikuta's trial mutual affray was a "nebulous" and "barely glimpsed theory on the margins." Kikuta testified that he blocked the Complainant's attempt to hit him with the crutch, and defense counsel argued that he punched the Complainant in self defense. Because the defendant did not request a mutual affray instruction and the testimony at trial did not clearly suggest that mutual affray applied, the trial court was not alerted that the failure to instruct the jury *sua sponte* on mutual affray was reversible error. Therefore, in my view, *Stenger* is distinguishable and the trial court was not obligated to instruct the jury *sua sponte* on the barely glimpsed theory of mutual affray.

Furthermore, the result of the majority's opinion is that in any case involving a fight with two active participants, the trial court must instruct the jury *sua sponte* on the defense of mutual affray. This holding is much too broad and far-reaching. The better rule would be to confine the instruction to situations that warrant it, and where the evidence supports it. Now, trial courts will be obligated to instruct the jury *sua sponte* on mutual affray even though that defense may have little or no application to the facts of the case.[6] In my view, this result is

---

5. The majority asserts that the majority opinion in *Stenger* is binding on this court. Majority opinion at 97 n. 14, 253 P.3d at 658 n. 14. Even assuming arguendo that is correct, the majority's argument is unpersuasive because *Stenger* is distinguishable. As discussed above, we have no case law in this jurisdiction requiring trial courts to instruct the jury *sua sponte* as to all available defenses.

Furthermore, although the majority notes some criticism of the *Marks* doctrine, federal courts have continued applying it. *See Jackson v. Danberg,* 594 F.3d 210, 219–20 (3d Cir.2010) (identifying the United States Supreme Court's holding by employing the *Marks* framework); *United States v. Robison,* 505 F.3d 1208, 1221 (11th Cir.2007).

6. The majority asserts that it is not requiring trial courts to instruct the jury on all available defenses, but only those supported by the evidence. Majority opinion at 97–98, 253 P.3d at 658–59.

However, the majority has set the threshold for a *sua sponte* defense instruction so low that its opinion effectively requires the trial court to instruct the jury *sua sponte* as to all available defenses. *See Stenger,* 122 Hawai'i at 306, 226 P.3d at 476 (Nakayama, J., dissenting). The facts of this case provide a good illustration of this argument. The majority holds that the trial court reversibly erred by failing to instruct the jury *sua sponte* on the defense of mutual affray because Kikuta testified that the Complainant attempted to strike him. However, many assault cases will involve two people fighting, and under the majority's analysis, trial courts will be required to instruct the jury *sua sponte* on the defense of mutual affray in those cases even though the defendant is not relying on that defense. The majority's decision effectively requires the trial court to ferret through the record unassisted by counsel and *sua sponte* instruct the jury as to all available and remotely tenable defenses. As discussed above, this is not a desirable result.

neither desirable nor compelled by this court's precedent. Therefore, I respectfully dissent.